COUNTY OF MITCHELL v. CITY NATIONAL BANK OF PADUCAH, KENTUCKY.

| 91 | 361 |
| 92 | 389 |

No. 562.—Decided January 10, 1898.

1. **Municipal Debts—Constitution.**
    Art. 11, sec. 7, of the Constitution, is complied with when, at the time of creating a debt, provision is made for the collection annually of a sufficient sum to meet the interest and provide a sinking fund therefor, though the rate per cent necessary to be levied therefor is not then determined. (P. 370.)

2. **Same—Authority to Levy Tax.**
    Section 9 of art. 8 and sections 2 and 7 of art. 11 of the Constitution are self-executing, in the sense that all laws in conflict are void, but do not in themselves authorize the levying of the tax required by the corporations named,—which must derive their authority to levy such tax from the Legislature. (P. 371.)

3. **Same—Power of Legislature.**
    If the Legislature had the power to grant authority to the corporation to make such provision, it could exercise such power itself, and the demands of the Constitution are met if the terms of the law are such that, when the county has issued its bonds in compliance, the bondholder might resort to a court, and by mandamus compel the county to levy a tax sufficient. (P. 371.)

4. **Same—Provisions for Payment.**
    The provision required by the Constitution means such fixed and definite arrangements for the levying and collecting of such tax, as would become a legal right in

favor of the holders of bonds issued thereon or person to whom such debt might be payable.   The law must itself provide or require the municipal authorities to levy and collect a tax sufficient to produce the minimum prescribed by the Constitution. (Pp. 371-373.)

**┼᠆Same—Statutes and Constitution Construed.**

Sections 1 and 2 of the Act of February 11, 1881 (General Laws, 1881, p. 5), and sections 1 and 2 of the Act of 1884 (General Laws, Special Session, 1884, pp. 29, 30), should be construed to harmonize with article 11 section 7 of the Constitution, and be held to commend the levy and collection of a sinking fund of not less than two per cent as there required. (Pp. 373-378.)

**┼᠆6.   Same—County Bonds—Provision for Payment.**

The Commissioners Court of a county, having determined to build a court house, authorized the issuance and sale of bonds under authority of such statutes, for that purpose, which necessitated a levy within the amount of taxes permitted by law, for the payment of interest and creation of sinking fund thereon, but they did not provide, at the time, for the levy of such taxes.  Held, that it was a legal duty resting upon the court, after issuing and selling the bonds, to annually levy and collect the tax necessary to raise the interest and sinking fund, not less than the minimum expressed in the law (the levy of a greater amount being within their discretion),— the performance of which the District Court had power to enforce by mandamus; that the requirement of the Constitution was sufficiently met; and that the bonds were not void for failure of the court to make provision for the interest and sinking fund at the time of issuance.  (Pp. 365-380.)

**—7.   Municipal Bonds—Purchaser—Notice.**

Purchasers of municipal bonds are charged with notice of what appears on the face of the order authorizing their issuance, but not of a separate order directing the appropriation of their proceeds, on sale, by the officers of the county, to a purpose for which such bonds could not be issued, and innocent purchasers would be protected in spite of the existence of such order.  (Pp. 380-382 )

**—8.   Same.**

But where bonds were issued under an order which on its face expressed a purpose to use them unlawfully (as to use road and bridge bonds for building a court house) purchasers were chargeable with a knowledge of such fact, which they would have learned by examination of the order under which their bonds were issued,—and could not enforce them.  (Pp. 382, 383.)

ERROR to the Court of Civil Appeals for the Second District, in an appeal from Mitchell County.

The bank brought suit against Mitchell County to recover upon interest coupons on some $30,000 of municipal bonds held by it.   Plaintiff had judgment below and the county appealed and on affirmance obtained writ of error from the Supreme Court.

*R. H. Looney* and *Smallwood & Smith,* for plaintiff in error.—The mandate of the Constitution of this State is clear and imperative that no county shall, or can, create any debt in any manner for any purpose whatever, unless provision is made at the time of creating the same for levying and collecting a sufficient tax to pay the interest thereof, and provide at least two per cent as a sinking fund.   And in order to claim liability upon the part of defendant to pay the bonds described in plaintiff's petition, or the coupons sued upon, it was the duty of plaintiff to both allege and prove that said constitutional requirement was complied with.   Const. of Texas, art. 11, sec. 7; Citizens Bank v. Terrell, 78

Texas, 450; City of Terrell v. Dessaint, 71 Texas, 772; Biddle v. City of Terrell, 82 Texas, 335; Bolton v. City of San Antonio, 21 S. W. Rep., 64; City of Waco v. McNeil, 29 S. W. Rep., 1109; NcNeil v. City of Waco, 33 S. W. Rep., 323; Bank v. Nolan County, 59 Fed. Rep., 661; Millsap v. City of Terrell, 60 Fed. Rep., 194.

Said section 7, article 11, of the Constitution, applies alike to all counties of this State, and not only to those bordering on the coast of the Gulf of Mexico. City of Terrell v. Dessaint, 71 Texas, 770.

The act of 1881 which authorized the issuance of the court house bonds, and the act of 1884 which authorized the issuance of the bridge bonds, did not meet the requirement of said section 7, article 11, of the Constitution, notwithstanding said acts provided, that, whenever bonds were issued thereunder, the Commissioners Court should levy an annual ad valorem tax on the property of the county sufficient to pay the interest and create a sinking fund for the redemption of said bonds, because said section requires that the provision for paying the interest and creating a sinking fund for the redemption of the bonds, must be made at the time of creating the debt or issuing the bonds.

Purchasers of county bonds are chargeable with notice of the orders made by the Commissioners Court by virtue of which the bonds are issued, and if it appears from the face and recitals of said orders that the bonds were issued for a purpose not authorized by law the bonds are void and such purchaser cannot claim to be an innocent purchaser in good faith. Polly v. Hopkins, 74 Texas, 145.

*Millard Patterson*, for defendant in error.—Section 7, article 11, of the Constitution of Texas, should be limited in its application to counties and cities bordering on the coast of the State. Const., art. 11, Sec. 7; Waxahachie v. Brown, 67 Texas, 527.

Even if it is true that section 7, article 11, of the Constitution, applies to inland counties, or to any county in Texas that has ever constructed a court house under the act of 1881 and subsequent acts, then we urge, that at the time the bonds involved in this suit were issued "provision" for the levying and collecting of a tax sufficient to pay the interest and provide a sinking fund (of much more than two per cent) had been make by the Legislature of Texas, and such provision has ever since existed. And it was never contemplated by the framers of the Constitution of 1876, that the County Commissioner's Court should make the "provision" mentioned in section 7, article 11, of the Constitution of Texas, for the levying and collecting of a tax sufficient to pay the interest and provide at least two per cent as a sinking fund upon the indebtedness therein referred to. Const., sec. 7, art. 11; Const., (1869), art. 12, sec. 23; Heigel v. Wichita Co., 84 Texas, 394; Trinity Co. v. Polk Co., 58 Texas, 325; Ex-parte Towles, 48 Texas, 429; Alley v. Denson, 8 Texas, 301.

Only the Legislature could make "provision" for the creation of a court house debt, or a tax to pay the same, and after such "provision,"

and not before, the Commissioner's Court might levy and collect a tax. Const., art. 11, sec. 2; 2 Am. & Eng. Encycl. Law, 349; 25 Am. & Eng. Encycl. Law, 186.

Under the act of 1881, and in all of the subsequent amendments of the same, "provision" is first made for the creation of a court house debt, and "provision" is then made for the levying of an annual ad valorem tax sufficient to pay the interest and create a sinking fund for the redemption of the bonds provided for, not to exceed one-fourth of one per cent for any one year, and the amount of the bonds is limited to such a number as a tax of one-fourth of one per cent annually will liquidate in ten years, and the bonds provided could only run fifteen years. Sayles' Stats., art. 986a.

Under the act of 1887 respecting bridge bonds, "provision" is first made for the creation of a debt for bridges, and "provision" is then made for the levying of an annual ad valorem tax not to exceed fifteen cents of the one hundred dollars' valuation, sufficient to pay the interest on and create a sinking fund for the bridge bonds authorized. And the sinking fund is required to be not less than four per cent of the full sum for which the bonds are issued, and the amount of the bridge bonds to be issued is further limited by the terms of section 3 of article 986b, Rev. Stats. Sayles' Stats., art. 986b; Nolan Co. v. State, 33 Texas, 197.

The statutes existing at the time of the issuance of the bonds involved, became a part of the contract with the bondholder and they protect him.    14 Am. & Eng. Encycl. Law, 187; 4 Id., 389; 15 Id., 1308.

The duty to levy existing by virtue of the statute, mandamus would lie, even before judgment.    15 Am. & Eng. Encyl. Law, 1313; 2 Dillon, Munic. Cor., sec. 857.

The county commissioners, at the time the bonds were issued, could have passed no order that could have been of any effect whatever.    A resolution to the effect that it was the purpose of the county to levy annually a tax sufficient, etc., would have amounted to nothing more than a declaration upon the part of the commissioners that it was their intention to comply with the law.    Bassett v. El Paso, 88 Texas, 174.

The trial court did not err in holding that the bridge bonds mentioned in said third assignment of error were valid obligations of the defendant.    At the time the bonds were issued Mitchell County was authorized by law to issue bonds of the kind involved, for the purpose of buying or constructing bridges for public uses within said county." The bonds recite that they were issued, "for the purpose of obtaining money to buy and construct bridges for public uses within the County of Mitchell in pursuance of an act entitled an act to authorize counties to issue bonds for bridge purposes and to levy a tax to pay the same; passed at the special session of the Eighteenth Legislature, convened at the City of Austin, Texas, January 8, and adjourned the sixth day of February, 1884."    Special Acts, p. 29, ch. 18.    They were all issued by virtue of orders of the Commissioners Court of Mitchell County, and are as they purport to be, the negotiable obligations of said county, and

not of the officers who signed the same, and the plaintiff having paid value for the bonds, without actual knowledge of their illegality, in view of the recitals upon the face of the same, the County of Mitchell would be estopped to set up that they were not issued for the purpose for which they purported to be issued.

The recitals in the bonds were sufficient: Nolan County v. the State, 83 Texas, 197; Mercer County v. Hackett, 1 Wall., 83, Dixon County v. Field, 111 U. S., 83; Moran v. Miami County, 2 Black, 722; Humboldt Township v. Long, 92 U. S., 642; Marcy v. Oswego Township, 92 U. S., 637; Chambers County v. Clews, 21 Wall., 317; Davies County v. Huidekoper, 98 U. S., 98; Board, etc. v. Cornell University, 57 Fed. Rep., 149; Tiedeman Pub. Cor., 383.

There is a broad distinction between a total lack of power and an improper exercise of power. Ball, Hutchins & Co. v. Presidio County, 88 Texas, 60; Nolan County v. State, 83 Texas, 197; Davies County v. Huidekoper, 98 U. S., 98; Moran v. Miami County, 2 Black, 722; Tiedeman Pub. Cor., 380.

The trial court erred in holding that court house bonds numbers 21 to 30, inclusive, and bridge bonds numbers 33 to 62, inclusive, were only valid in part, for the reason, 1st. That plaintiff being an innocent purchaser of said bonds, it is not affected by the fact that there may have been an over-issue of same. 2nd. That even if there was an over-issue of same, all of said bonds were subsequently made valid by acts of the Legislature of Texas. Laws of Texas (1885), Chap. 42, pp. 40-41.

*M. M. Crane,* Attorney-General, and *W. M. Knight* and *E. P. Hill,* Assistants, on behalf of the State, as the holder of bonds to be affected by the decision, also filed an argument in support of the validity of the bonds sued on.

BROWN, ASSOCIATE JUSTICE.—The defendant in error sued Mitchell County in the District Court of that county to recover upon interest coupons alleged to have been attached to and representing the interest on certain bonds issued by the county for the purpose of building a court house and jail, and also to recover upon interest coupons alleged to have been attached to and representing the interest upon certain bonds issued by the said county for the purpose of constructing and purchasing bridges. The petition alleged, in substance, that Mitchell County, being without a court house on the different days therein mentioned, executed and delivered to Martin, Byrne and Johnson a certain negotiable or written obligation, in which it was recited that the said bonds or obligation were issued for the erection of a court house in said County of Mitchell, each and all of them being of like tenor and effect except their dates; each bond being for the sum of $1000 and bearing interest at the rate of seven per cent per annum, excepting numbers 51 to 55 inclusive, which bear eight per cent interest from date; each of the said bonds payable fifteen years from date. It

was also alleged that the said county, upon the different dates therein alleged, issued to bearer other bonds described in the petition, for the purpose of constructing and purchasing bridges for the said county, which said bonds were each for the sum of $500, payable in twenty years, bearing eight per cent interest from date.

It was alleged that the plaintiff was the legal and equitable owner and holder of the said bonds, and that the coupons sued upon represented the interest upon them for the several years mentioned therein, which the said County of Mitchell had failed and refused to pay, and that the said coupons had each been presented to the Commissioners Court of Mitchell County for payment according to law, which had been refused. It was alleged in the petition that all of the said bonds were issued according to the laws of the State of Texas which authorized their issue.

The defendant filed a general demurrer to the said petition, and a special exception thereto upon the ground that the petition showed that the defendant was a municipal corporation, that the alleged debt sued for is a debt not contracted for current expenses, and wholly fails to allege that at the time of the creation of the several debts evidenced by said alleged bonds and coupons the county made any provision for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent as a sinking fund to pay said indebtedness. The defendant also filed a general denial, and a special plea in which the county set up the fact that no provision had been made by it for levying and collecting a tax to pay the interest and the sinking fund upon the said bonds.

The District Court overruled the special exception number 2, the substance of which is above stated, but no action appears to have been taken on the general demurrer. Trial was had before the court without a jury, and judgment was given for the plaintiff bank against the defendant upon the coupons representing the interest of a portion of the bonds, and denied as to others, but it is not necessary here to designate the particular bonds which were sustained or those which were declared to be invalid.

The trial court filed conclusions of fact, from which we make the following statement of the facts necessary in the consideration of the questions presented on this writ of error:  On the tenth day of August, 1881, Mitchell County entered into a contract with Martin, Byrne and Johnson to build for it a court house and jail, for which the county was to pay them $33,250, the court house to cost $21,323 and the jail $11,-927. The county was to pay in its bonds which were to bear interest at seven per cent per annum, the bonds to be payable in fifteen years from their date and to have coupons attached representing the interest for each year. The first payment of $10,000 in bonds was to be made upon completion of the first story of the jail and foundation of the court house. The second payment to be made, of $10,000 of the bonds, when the jail was completed and accepted; and the last payment, $13,-

250, to be made in bonds when both the court house and jail were com-pleted.

On January 12, 1882, the county paid to the contractors $10,000, in ten bonds numbered from 1 to 10; on July 5, 1882, the county paid to the contractors ten bonds, for $1000 each, numbered 11 to 20 inclusive; April 25, 1883, the county paid to the contractors $10,000 in bonds numbered 21 to 30 inclusive. Of the aforesaid bonds the plaintiff owns Nos. 11 to 16 inclusive and 24 to 30 inclusive. The others are out-standing in the hands of other parties.

In 1884 the county, being again without a court house, issued to the same parties, Martin, Byrne and Johnson, twenty-two bonds of $1000 each, numbered from 34 to 55 inclusive, which were the same in form as the first bonds issued, and like them in every particular, excepting the date and that the latter bonds bear interest at eight per cent instead of seven. Of these last named bonds the plaintiff owns Nos. 51 to 55 inclusive. Each of the aforesaid bonds was payable to Martin, Byrne and Johnson or bearer.

At different times, as hereinafter stated, Mitchell County caused to be issued bonds numbered from 1 to 62, payable to bearer, each for the sum of $500, due twenty years from date, with eight per cent interest, and a coupon representing the interest for each year attached to each bond. Each of the said bonds contained the following recital: "This bond is issued for the purpose of obtaining money to buy and construct bridges for public uses within the said County of Mitchell, in pursuance to an act entitled 'An Act to authorize counties to issue bonds for bridge purposes and to levy a tax to pay the same,' passed at the special session of the Eighteenth Legislature, convened at the City of Austin, Texas, January 8th, and adjourned the 6th day of February, 1884." The plaintiff is the owner of these last named bonds numbered 1 to 26 inclusive and Nos. 34, 35, 60 and 61. The plaintiff paid value for all of the bonds herein stated as belonging to it, and acquired them in the regular course of business, without notice of any defect in them except such as the law would charge it to have upon the facts as shown upon the record of the Commissioners Court of Mitchell County.

The Commissioners Court of Mitchell County did not, at any time, make any provision for levying and collecting the tax to pay the interest upon the aforesaid bonds, or any of them, nor to raise a sinking fund for their redemption, except that for the year 1881 the court levied a court-house and jail tax of twenty-five cents on the $100. In 1882 it levied fifty cents on the $100 for the same purpose, and since that time, until 1895, it has levied annually twenty-five cents on the $100. For each year since the issuing of the bonds for bridge purposes the court has levied fifteen cents on the $100 as a tax for road and bridge pur-poses.

The taxable values of Mitchell County were, for the different years as follows: For 1881, $592,961; for 1882, $1,155,479; for 1883, $2,250,489; for 1884, $3,118,239. And the counties attached to Mitchell County for

judicial purposes had taxable values for the different years as follows: For 1881, $138,861; for 1882, $318,248; for 1883, $361,355; for 1884, $995,080.

The court found to be due upon the coupons in suit the following sums: Upon the court-house bonds the sum of $1820; and upon the bridge bonds the sum of $2720. The coupons which were sued upon were all presented to the Commissioners Court of Mitchell County, Texas, in proper form, and payment demanded, and all of them have been by said court wholly refused and disallowed.

On February 11, 1884, the Commissioners Court of Mitchell County made the following order, which was duly entered upon the minutes of that court: "Ordered that bonds of Mitchell County to the amount of $10,000 issue and be set apart for the building and improving of bridges, and for opening and improving public roads of said county, said bonds to bear 8 per cent interest and to run to the extent of the law, and to be taken up as the exigencies of the county demands." On June 3, 1884, bonds numbered 1 to 6 inclusive were issued under this order. May 27, 1884, the Commissioners Court ordered that a bond for $500 issue in favor of W. L. Pendleton, contractor for building bridges, etc. The clerk issued to Pendleton bond No. 9. August 13, 1884, the said court directed bonds for $100 ($1000) to be delivered to Mahoney and Evans, bridge builders, on their contract for $5800, and two bonds numbered 7 and 8 were delivered to them August 16, 1884. August 13, 1884, the Commissioners Court directed the clerk to issue bridge bonds to Mahoney and Evans for the balance due them on their contract and the clerk issued five bonds and delivered them to the contractors, being Nos. 14 to 18 inclusive.

On August 28, 1884, the Commissioners Court entered the following order: "That a special fund be established as the cash fund, which shall be set apart for the purpose of meeting any demands against the county that must necessarily be paid in cash; and that the clerk of this county issue four bonds on the road and bridge fund for the sum of $500 each, to run twenty years, with interest at 8 per cent per annum; said bonds to be sold and the fund transferred from the road and bridge fund to the cash fund." Four bonds were issued, being Nos. 10 to 13 inclusive, under the first order copied herein, and on January 12, 1885, two bonds were issued to pay for repairing bridges, being Nos. 19 and 20, which exhausted the order for the issuing of $10,000 of bonds.

We copy from the findings of the trial court as follows:

"On February 13, 1885, it was ordered by the court 'That instead of issuing scrip on the general fund to cover the amount of Martin, Byrne and Johnston's note, that same be paid out of money resulting from the sale of bridge bonds. And that the clerk is ordered to issue six bridge bonds of $500 each, and deliver the same to Wm. Martin, who is authorized to make sale of said bonds and, after deducting the amount of his note with interest thereon, to pay the remainder into the treasury to

the credit of the road and bridge fund.' Under this order bonds, numbered from 21 to 26 inclusive, were issued the 13th of February, 1885.

"On May 14, 1885, the court made an order 'That road and bridge bonds be issued to Martin, Byrne and Johnston, for the balance due on the new court house when it can be ascertained what said amount of balance is, after paying on said house all available cash that can be used for paying for same,' and on the same day, by order of the court, E. F. Swinney was appointed financial agent of the county to sell bonds so issued.

"On June 25, 1885, the court made the following order, viz: 'It is hereby made an order of this court that the road and bridge bonds ordered issued at a previous term of this court be issued and sold as directed in the minutes of that meeting. And it is further ordered to be recorded that the sum of money represented in and by the bonds to be issued and the same is made a loan from the road and bridge fund to the court house and jail fund, there being an excess of unexpended bonds in said road and bridge fund, and that the same be paid back to the road and bridge fund as it accumulates in the court house and jail fund from the collection of taxes in that fund. And it is made a part of this order that the sum of $15,000 in road and bridge bonds, the same being thirty bonds of $500 each, be issued and sold as the law directs, that is at not less than par value; the contractors to receive what cash there is now in the county treasury belonging to the court house and jail fund, the sum of $1306.56, and to be paid by an order of this court the sum of money yet uncollected as taxes in the court house and jail fund on the tax roll to be collected this fiscal year, amounting, probably, to $1900. This last payment to be made only after deducting all legal offsets claimed by the county in the way of rents, unfinished work on the court house, reservations in the contract as to delay in its completion, etc.; the same to be ascertained by the Commissioners Court at a regular meeting when there is a full board present.' Upon this order on June 27, 1885, thirty bridge bonds were issued, numbered from 33 to 62 inclusive.

"On August 14, 1885, there was an order of the court that the clerk issue a warrant on the court house and jail fund in favor of Martin, Byrne and Johnston for the sum of $16,892.11, balance due on the new court house. And ordering the treasurer to collect of E. F. Swinney, financial agent, the sum of $14,925, the amount for which said bonds were sold, less $75 commissions allowed him, and that the same be paid on the said warrant."

This suit was instituted by the defendant in error against Mitchell County to recover of it the amounts specified in the several coupons described in the petition, which represent the interest that had accrued upon the bonds of the said county which defendant in error claims to own. The plaintiff in error contends that the bonds are void because, at the time the debt was created, no provision was made by the county for levying and collecting a tax to pay the interest and to provide a

sinking fund as required by the following section of the Constitution: "All counties and cities bordering on the coast of the Gulf of Mexico are hereby authorized, upon a vote of two-thirds of the tax-payers therein (to be ascertained as may be provided by law), to levy and collect such tax for construction of sea walls, break-waters or sanitary purposes, as may be authorized by law, and may create a debt for such works and issue bonds in evidence thereof. But no debt for any purpose shall ever be incurred in any manner by any city or county unless provision is made, at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent as a sinking fund; and the condemnation of the right of way for the erection of such work shall be fully provided for." Article 11, section 7. The defendant in error claims that the article quoted does not apply to counties other than coast counties. Without deciding that question we will examine the case under the assumption that the article of the Constitution applies to all counties and that the Legislature so regarded it in enacting the laws under which the bonds in question were issued.

It was not the purpose of the convention in adopting the foregoing article to require that a city or county should, at the time of creating a debt, ascertain the rate per cent required to be levied upon the taxable values of the county in order to raise a sufficient sum to pay the interest and provide a sinking fund upon that debt, and to actually levy that rate of tax at the time. Bassett v. El Paso, 88 Texas, 175. In the case cited the City of El Paso had at the time that it determined to issue its bonds, by an ordinance, provided for the collection annually of a given sum for the purpose of paying the interest which might accrue upon the said bonds and also a given sum to be raised annually as a sinking fund. This court said: "The language and purpose of these provisions (of the Constitution) seem to be satisfied by an order providing for the annual collection by taxation of a sufficient sum to pay the interest thereon and create a sinking fund, etc., though it does not fix the rate or per cent of taxation for each year by which such sum is to be collected, but leaves the fixing of such rate for each successive year to the Commissioners Court or City Council. * * *.

"As stated above, we have not deemed it necessary to determine whether the order of August 11, 1893, actually levied a tax, as we are of the opinion that it fully complied with the law by making provision for the collection of the interest and sinking fund by taxation."

What the Constitution requires is, that provision shall be made at the time or shall have been previously made, by which the rate of tax to be levied is so definitely fixed—as was done in the case last cited—that it becomes merely a ministerial act to determine the rate to be levied. The Legislature has the power to make all such "provision" for counties and cities, or it may leave it to the officers of such corporation to make it when the debt is created; if made by either it is sufficient. Mitchell County has not provided for the collection of such tax, and the solution

of the question now before us depends upon whether the laws under which the bonds were issued made such "provision" as the Constitution required.

On behalf of Mitchell County it is urged that by the terms of section 7, article 11, of the Constitution, the "provision" which is required to be made for levying and collecting taxes with which to pay the interest and create a sinking fund upon the indebtedness of a county must be made by the officers of the county at the time the debt is incurred, and that the source of authority for making the levy and collecting the tax is the Constitution, and not the act of the Legislature. The only parts of the Constitution which bear upon this subject are section 9 of article 8, and sections 2 and 7 of article 11. Section 9 confers no authority upon any officer of a city or county to levy a tax for any purpose, but by the language "no county, city or town shall levy more than one-half of said State tax, * * * and for the erection of public buildings not to exceed fifty cents on the one hundred dollars in any one year," places a prohibition of limitation upon the power of the Legislature to authorize counties to impose taxes for such purposes. Section 2 of article 11 expressly requires the enactment of a general law to carry its mandates into effect; and section 7 of the same article contains no grant of authority to levy a tax nor designation of any official by whom the tax specified is to be levied and collected, but is, in effect, a limitation upon the power of the Legislature to authorize such corporations to create debts. In the sense that all laws in conflict with these prohibitions are void, section 9, article 8, and section 7, article 11, are self-executing, but in so far as anything is required to be done to carry them into effect they are not so, because they prescribe no rules by which any act could be done in the enforcement of their requirements. In his work on Constitutional Limitation, page 100, Mr. Cooley says: "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which these principles may be given the force of law." It is quite too plain for argument that if the laws of 1881 and 1884, or similar laws, had never been passed, Mitchell County would have had no authority under the Constitution to contract the debts represented by the bonds nor to levy a tax for the payment of the interest and sinking fund on such debt; the power to do so could be derived from the Legislature only. If the Legislature had the power to grant authority to the county to make such provisions, then that department could exercise the power itself.

If the terms of the law are such that, when the county has issued its bonds in compliance with it, the bondholder might resort to a court and by mandamus compel the county to levy a tax sufficient to pay the interest annually and to raise a sinking fund of not less than two per cent, then the provision would be sufficient under the Constitution.

Whether less certain directions might meet the demands of the Constitution is not before us. This brings us to the consideration of the question, were the requirements of the statutes under which these bonds were issued so explicit as to constitute a compliance with the mandate of the Constitution.

The bonds known as court house bonds were issued under an act of the Legislature approved February 11, A. D. 1881, sections one and two of which read as follows:

"Section 1. That the County Commissioners Court of any county which has no court house at the county seat is hereby authorized and empowered to issue the bonds of said county, with interest coupons attached, in such amounts as may be necessary to erect a suitable building for a court house; said bonds running not exceeding fifteen years, and redeemable at the pleasure of the county, and bearing interest at a rate not exceeding eight per cent per annum.

"Sec. 2. The Commissioners Court of the county shall levy an annual ad valorem tax on the property of said county, sufficient to pay the interest and create a sinking fund for the redemption of said bonds, not to exceed one-fourth of one per cent for any one year." Gen'l Laws 1881, p. 5.

The bridge bonds were issued under an act of the Eighteenth Legislature, special session, 1884, the first and second sections of which read as follows:

"Section 1. That the County Commissioners Courts of the several counties of the State are hereby authorized and empowered to issue the bonds of said county, with interest coupons attached, for such amounts as may be necessary for the purpose of buying or constructing bridges for public uses within such county, said bonds to run not exceeding twenty years and bear interest at any rate not to exceed eight per cent per annum.

"Sec. 2. The Commissioners Court shall levy an annual ad valorem tax not to exceed fifteen cents on the one hundred dollars valuation, sufficient to pay the interest on, and create a sinking fund for the redemption of said bonds. The sinking fund herein provided for shall not be less than four per cent on the full sum for which the bonds are issued." Gen'l Laws, Special Session, 1884, pp. 29-30.

The statutes quoted above were enacted by the Legislature in view of the requirements of sections two and seven, article eleven, of the Constitution, and with the evident purpose of giving effect to the terms of those sections. As we have said before, the Legislature might have empowered the Commissioners Court to provide for collecting the tax required by the Constitution, but it pursued, as we think, the wiser course of making the necessary provision by a general law, which applied to and governed the issuance of all bonds for the given purpose, whereby the tax-payer and the bondholder would be alike protected and uniformity secured.

Under such system the purchaser of bonds could easily ascertain the extent to which the taxing power of a county had been appropriated,

and by looking to the taxable values of the county could form a just estimate of the worth of such securities, which we think would greatly tend to enhance their market value. Tax-payers would be furnished the means of learning the manner in which their finances had been managed by those to whom they had entrusted the business affairs of the county, and in case such officers sought re-election, could easily call them to account for any failure in the discharge of their duties. The effect of such legislation would be to compel a county to keep its indebtedness within the limits of its present power of taxation instead of piling up a debt which would absorb the future revenues of the county.

Counsel for defendant in error in their briefs and printed argument, as well as in an able argument before the court, contend, that, by the enactment of section two of the act of 1881, the Legislature intended to require of the Commissioners Court to levy and collect a sinking fund sufficient to discharge the bonds at maturity, and that, since the bonds could not run for a greater time than fifteen years, the sinking fund must necessarily exceed two per cent, and thus the Constitution would be complied with. The position is plausible, but we are of opinion that the Legislature intended by the use of the words, "and create a sinking fund for the redemption of said bonds not to exceed one-fourth of one per cent in any one year," to fix the minimum sinking fund at the rate prescribed by the Constitution, and to limit the maximum by that amount which could be raised from a tax of one-fourth of one per cent. Section seven of article eleven of the Constitution, by prohibiting the creation of a debt unless provision was made for creating a sinking fund of at least two per cent, thereby prescribed that the sinking fund should not be less than the rate per cent named, and the Legislature could not therefore fix a rate nor authorize the Commissioners Court to fix a rate less than that prescribed by the Constitution.

If, as claimed by the plaintiff in error, section seven of article eleven of the Constitution applies to all counties and cities in the State (which we assume in this discussion) then every law enacted by the Legislature which authorizes the creation of a debt by cities or counties must conform to the requirements of that section or it will be invalid. In other words, a law which authorized the creation of a debt by a city or county, and did not provide for or authorize the municipal authorities to provide for levying and collecting a tax sufficient to pay the interest on such debt and create a sinking fund of at least two per cent for its payment, would be void. We understand that the provision required by the Constitution means such fixed and definite arrangements for the levying and collecting of such tax as would become a legal right in favor of the holders of bonds issued thereon or in favor of any person to whom such debt might be payable. It is not sufficient that the municipal authorities should by the law be authorized to levy and collect a tax sufficient to produce a sinking fund greater than two per cent, but to comply with the Constitution the law must

itself provide for a sinking fund not less than two per cent or require of the municipal authorities to levy and collect a tax sufficient to produce the minimum prescribed by the Constitution.

The laws of 1881 and 1884 being enacted by the Legislature in pursuance of and for the purpose of putting into force the constitutional provisions before cited, it is the duty of the courts to so construe the terms of the laws as to make them valid and to give effect to them. Under section 7, article 11, the Legislature could not have empowered the Commissioners Court to create a sinking fund of less than two per cent, and as the Commissioners Court could not, under the law and the Constitution, have fixed a sinking fund at less than that rate, we must construe the language used in the act of 1881, section two, which commands the Commissioners Court to levy and collect a sinking fund for the redemption of the bonds to mean a sinking fund of not less than two per cent as defined and limited in the Constitution. G. B. & C. N. G. Ry. Co. v. Gross, 47 Texas, 428; McKenzie v. Baker, 88 Texas, 677; Rosenberg v. Weekes, 67 Texas, 579; U. S. v. Coombs, 12 Peters, 72; Grenada County v. Brogden, 112 U. S., 261; Bailey v. Phila. & Baltimore R. R. Co., 4 Harrington, 389; 44 Am. Dec., 593; Duncomb v. Prindle, 12 Iowa, 1; Millay v. White, 86 Ky., 170; Temmick v. Owings, 70 Md., 246; Marshall v. Grimes, 41 Miss., 27; Bigelow v. Wis. R. R. Co., 27 Wis., 478; McWigan v. Railroad Co., 95 N. C., 429; Nolan County v. State, 83 Texas, 195. In case of G. B. & C. N. G. Ry. Co. v. Gross, cited above, the Railroad Company brought suit against Gross, the Commissioner of the Land Office, to compel him to issue to the Railroad Company certificates for lands which might be located singly, as in the case of headright certificate. The charter of the Railroad Company was enacted on the second day of February, 1875, and provided: "Whenever any section of five miles of said road has been completed, the said Company, through its president and secretary, may give notice of the same to the Governor of this State, in writing, whose duty it shall be, on receipt of such notice, to order the State Engineer, if there be any, or if there be none, then to appoint a skillful engineer to examine the said section of road and report under oath; and if said section of five miles of said road be found to be constructed and in running order, in substantial manner, then the Governor shall certify the same to the Commissioner of the General Land Office, and he shall issue to the said company sixteen land certificates, of six hundred and forty acres each, for each and every mile of road so constructed and put in running order, and in like manner with each and every succeeding five miles of said road until the whole has been completed." In 1876 the Governor gave his certificate in the manner required by law and the Railroad Company applied to the Commissioner of the General Land Office for eighty land certificates for six hundred and forty acres each, such as might be located and surveyed in single sections, which the Commissioner refused to issue, but proposed to issue certificates conditioned so as to require each certificate to be located upon two

tracts of six hundred and forty acres each, one for the Railway Company the other for the Public School fund. The Railroad Company refused to accept these certificates, and brought suit to obtain a writ of mandamus against the Commissioner, compelling him to issue the certificates as demanded. On March 18, 1873, the Legislature passed an act by which it set apart to the public school fund one-half of the public domain and prescribed "that all land certificates heretofore issued to any Railroad Company or any other corporation of any nature whatever for internal improvements or for any other object or any lands hereafter granted in any manner to any of said corporations or companies for any such object, shall be located and surveyed in alternate sections of 640 acres each, as directed by an act entitled 'an Act to encourage the construction of railroads in Texas by donations of land,' approved January 30, 1854." The charter of the Railroad Company was enacted subsequently to the last above cited Act of the Legislature and the question before the court was, whether the grant of the certificates therein should be construed so as to give effect to the law of 1873. In discussing the question this court said: "At the time the appellant's charter was granted we hold that there was in force a general law which required the certificates to railroads to be in alternate sections, which certificates may be located and patented on any of the public domain of this State according to the general law on the principle of alternate sections. * * * We think that the act incorporating this Railroad Company was passed with reference to the system of locating and surveying railroad certificates which had long been in force, and that it was the legislative intent to conform to that system and thereby preserve uniformity in the amount and character of bounty extended." And the court held that the language of the charter must be construed as if it provided for the issuing to the Railroad Company of certificates to be located in alternate sections as required in the general law.

In 1860 the Legislature of the State of Mississippi enacted a law whereby certain counties of the State might subscribe to the capital stock of a railroad company upon a vote of the majority of the legal voters of the county. In 1871 the Legislature of that State so amended the law of 1860 as to include in its terms the county of Greneda. In the bill amending the former law it was provided that elections upon the subject of issuing bonds in aid of railroads should be held in accordance with the law of which that was amendatory and in accordance with the provisions of the Constitution of the State. In 1869, after the enactment of the original law, that State adopted a Constitution in which was a provision forbidding the Legislature to pass any law authorizing a county to subscribe for stock in a railroad unless it was assented to by two-thirds of the qualified voters of that county. The county of Greneda upon a two-thirds vote of its qualified voters subscribed for $50,000 of the capital stock of a railroad company, issuing bonds therefor, and being sued upon the bonds defended the action upon the ground

that the law under which they were issued was void because it authorized their issue upon a majority instead of a two-thirds vote as required by the Constitution.   There was a direct conflict between the language of the Act of the Legislature and the Constitution, except that the amendatory act prescribed that the election should be held in accordance with the Constitution.   The Supreme Court of the United States, in the case of Greneda County v. Brogden, 112 U. S., 261, construed the statute to mean that a two-thirds vote was required in order to issue the bonds, and thereby made the act conform to and harmonize with the Constitution of the State and with the policy of the State upon this subject. That court said: "It certainly cannot be said that a different construction is required by the obvious import of the words of the statute.   But if there were room for two constructions, both equally obvious and reasonable, the court must, in deference to the Legislature of the State, assume that it did not overlook the provisions of the Constitution, and designed the act of 1871 to take effect.   Our duty, therefore, is to adopt that construction which, without doing violence to the fair meaning of the words used, brings the statute into harmony with the provisions of the Constitution."

Article 4861 of the Revised Statutes reads as follows:   "No court of this State shall have power, authority or jurisdiction to issue the writ of mandamus, or injunction, or any other mandatory or compulsory writ of process against any of the officers of the executive departments of the government of this State, to order or compel the performance of any act or duty which, by the laws of this State, they or either of them are authorized to perform, whether such act or duty be judicial, ministerial or discretionary."

And article 946 is in the following language:   "The Supreme Court, or any justice thereof, shall have power to issue writs of habeas corpus as may be prescribed by law; and the said court, or the justices thereof, may issue writs of mandamus, procedendo, certiorari and all writs necessary to enfore the jurisdiction of said court; and in term time or vacation may issue writs of quo warranto or mandamus against any District Judge or officer of the State government, except the Governor of the State."

In McKenzie v. Baker, 88 Texas, 677, the question was made that article 4861 forbids that any court in this State should issue a mandamus against the heads of the departments of the State government, and that therefore this court had no jurisdiction to grant the writ prayed for.   The question before the court was, which of these articles should yield, if they could not be so construed that both could stand, and Judge Gaines, for the court, said:   "The rule is, that where a general intention is expressed, and the act expresses also a particular intention incompatible with the general intention, the particular intention is to be considered in the nature of an exception.   This is no arbitrary canon of construction, but is a rule founded upon experience and sound reason.   It follows from this rule, that article 4861 should be

construed to read:  'No court in this State except the Supreme Court shall have power, etc.'  This construction preserves both articles, and that construction should always be avoided by which any provision of the statute would fail altogether."  It will be observed that the court decided that article 946 should stand in preference to the other article, if one must yield, and in order that both might be preserved and given effect to, the language of article 4861 was construed so as to embrace an exception understood but not expressed.

In Nolan County v. State, 83 Texas, 195, the court had under consideration section 3 of the act now under examination, which is in these words:  "The county shall not issue a larger number of bonds than a tax of one-fourth of one per cent annually will liquidate in ten years, and such bonds shall be sold only at their face or par value." Independent of the Constitution the language quoted committed to the Commissioners Court the power to determine what amount of bonds could be liquidated in ten years by a tax of one-fourth of one per cent, but the court held that this section must be construed in connection with the constitutional limitation contained in original section 9, article 8, of the Constitution, which reads:  "The State tax on property, exclusive of the tax necessary to pay the public debt, shall never exceed fifty cents on the one hundred dollars valuation; and no county, city or town shall levy more than one-half of said State tax, except for the payment of debts already incurred, and for the erection of public buildings, not to exceed fifty cents on the one hundred dollars in any one year, and except as in this Constitution is otherwise provided." Const., 1876.  Judge Gaines, for the court, said:  "If our Constitution were silent upon this subject, then it might reasonably be held that section 3 of the statute quoted above authorized the commissioners courts to determine the question as to the amount of bonds 'a tax of one-fourth of one per cent annually will liquidate in ten years.'  But there being a provision in the Constitution bearing directly upon that subject, we are of the opinion that this section must be construed in connection with it.  The limit in the Constitution being an amount upon which a tax of one-half of one per cent would pay annually the interest and two per cent as a sinking fund, and the statutory requirements being such an amount only as one-fourth of one per cent would liquidate in a period of ten years, it was not absolutely necessary that the commissioners should be governed by the same rule in determining the two limits.  An amount of indebtedness that would be liquidated within ten years, though based upon a valuation in excess of that shown by the assessment rolls, might still be within the constitutional limit, which permits the creation of such a debt as will be ultimately paid by an annual tax of one-half of one per cent upon the taxable values of the county as shown by the official assessment.  But we think it more reasonable to presume that the Legislature intended that the same rule should govern in determining both limits, and that the commissioners courts should not look beyond the assessment rolls in ascer-

taining the amount of the indebtedness which the statute authorizes them to create." Section 3 of the same act of which we are considering section 2 was construed by this court as if it read: "The county shall not issue a larger number of bonds than a tax of one-fourth of one per cent on the taxable values, as shown by the tax rolls of the county, will liquidate in ten years."

We conclude that section 2 of the act of 1881 authorizing the issuance of court house bonds should be read as if the words of the Constitution had been introduced into the act itself, that is, as follows: "The Commissioners Court of the county shall levy an annual ad valorem tax on the property in the said county sufficient to pay the interest and create a sinking fund of not less than two per cent for the redemption of the said bonds, not to exceed one-fourth of one per cent for any one year."

So reading section 2 of the law of 1881, both acts under which the bonds in question were issued are practically the same so far as the question of their compliance or non-compliance with the Constitution is concerned; and we now come to inquire whether those laws make such provision for the levying and collecting of a tax to pay the interest on the bonds issued thereunder and to create a sinking fund for their redemption as is required by section seven article eleven of the Constitution.

If the District Court of Mitchell County could, upon a proper showing of the facts, have required the Commissioners Court of that county to levy and collect a sufficient tax to pay the interest upon the bonds and create a sinking fund of not less than two per cent per annum, and could have enforced that requirement by a writ of mandamus, then the provision made by the statutes is a sufficient compliance with the Constitution, and the bonds, so far as that question affects them, would be valid. For the purpose of testing the sufficiency of those statutes in this particular, we will examine them in reference to their application to the court house bonds involved in this litigation.

There being no court house in the County of Mitchell, the Commissioners Court of that county was by law vested with the discretionary power to determine the following questions with reference to making the improvement needed: (1) Whether it would build a court house or not; (2) What the cost of the building should be; (3) Whether the building should be paid for by the sale of bonds or otherwise; (4) If by selling bonds, then at what time the bonds should mature and the rate of interest they should bear; (5) What sinking fund exceeding two per cent, if any, should be provided within the limits of the law. That court exercised the discretion vested in it upon all matters above named except the sinking fund. No per cent for a sinking fund has been named by the court, and we must examine the question upon the basis that the minimum expressed in the law is to govern as to the sinking fund to be provided for by the levy of taxes. In order to simplify the matter we will consider the first ten thousand dollars in bonds, issued in 1882, as if they constituted the entire series of bonds issued for the pur-

pose of building a court house, for the reason that this issue was alone based upon the assessment of values for the county for the year 1881, and we can more readily apply the principles which are to govern in the determination of this question by thus limiting the inquiry than we could by pursuing the examination through all the various issues of the different classes of bonds.

The tax rolls of Mitchell County for the year 1881 showed the taxable values of that county to be $592,961. The Commissioners Court of the county determined to build a court house, for which purpose bonds payable at fifteen years from date, to bear seven per cent interest per annum, to the amount of $10,000, were issued and sold by the county. We have here stated the data from which by a simple calculation we can arrive at the sum to be collected each year for the purpose of paying the interest upon the bonds and provide a sinking fund for their redemption. Two per cent on ten thousand dollars would give two hundred dollars annually as the sinking fund to be collected, and seven per cent on that sum would yield seven hundred dollars necessary to be collected as interest, aggregating nine hundred dollars to be raised the first year to pay interest and sinking fund upon a taxable value of $592,961, which would require a levy of a fraction more than fifteen cents on the one hundred dollars of taxable values. The Commissioners Court in fact levied twenty-five cents on the one hundred dollars of values for the first year, and continued to levy that rate per cent for each subsequent year up to 1895. In order to test the question that we have suggested, that is, did there remain anything to be done by the Commissioners Court which involved the exercise of discretion, let us suppose that court had refused to levy the tax after the bonds were issued and sold, and that the bondholders, upon a proper showing, applied to the District Court for a writ of mandamus to compel the Commissioners Court of Mitchell County to levy a tax sufficient to raise the interest and sinking fund at the rate prescribed as the minimum.

What answer could the Commissioners Court of that county have made to such an application? As we have before shown, the act of issuing the bonds necessarily determined every fact involved in making provision for the interest and sinking fund, except the taxable values of the county, which was a matter of record and shown by the tax rolls by which the Commissioners Court must be governed. What remained to be done that might be done by one person or court in a manner different from that in which another person or court might perform the same act? It may be answered, that the Commissioners Court had the discretion to fix any rate of sinking fund not less than two per cent which would not make the taxes for any one year exceed twenty-five cents on the one hundred dollars, and that this was a matter of discretion. That is true, but that court had not the discretion to provide for no sinking fund, nor had it the discretion to provide for a sinking fund less than two per cent. It therefore follows, that it was a legal duty resting upon that court, after issuing and selling the bonds under the

authority given in the first section of each act, to annually levy and collect the tax necessary to raise the interest and sinking fund, not less than the minimum expressed in each law, and the District Court had the authority to enforce the performance of that duty by writ of mandamus, but would not control the discretion vested in the Commissioners Court to levy and collect a tax which would provide for a sinking fund greater than two per cent.

We think it manifest that there was no act involved in the performance of the duty enjoined by section two of each of the acts which required the exercise of any discretion on the part of the Commissioners Court, but that, having determined the questions upon which the issuing of the bonds depended, there remained nothing to be done but to perform the ministerial act of ascertaining the sum to be collected and the rate per cent necessary to be levied upon the taxable values of the county each year, and that the performance of this duty the District Court had the authority to enforce by a writ of mandamus.    DePoyster v. Baker, 89 Texas, 155; Comm'r Gen'l Land Office v. Smith, 5 Texas, 471; Coy v. City Council of Lyons, 17 Iowa, 1; 85 Am. Dec., 539; Manor v. McCall, 5 Ga., 522; Tarver v. Talapoosa, 17 Ala., 527; Stevenson v. Summit, 35 Iowa, 462.

The plaintiff in error insists that Nos. 10, 11, 12, 13, 21, 22, 23, 24, 25, 26, 34, 35, 36, 37, 60 and 61, of the bridge bonds, are void because they were issued for a purpose not authorized by law, and that the defendant in error is chargeable with notice of the facts which appear upon the record of the Commissioners Court in reference thereto. The Court of Civil Appeals held that the bonds were valid in the hands of the defendant in error, because it acquired them in the course of business, for a valuable consideration, before maturity, and without actual notice of such defects, and because each of the said bonds contained a recital that it was issued, "for the purpose of obtaining money to buy and construct bridges for public use within the county of Mitchell, in pursuance of an act entitled 'An Act to authorize counties to issue bonds for bridge purposes and to levy a tax to pay the same,'" etc. The Court of Civil Appeals said: "We do not think under the circumstances stated that the purchaser was required to examine the orders of the Commissioners Court for the purpose of testing their validity," and in support of that position cited and quoted from Nolan County v. The State, 83 Texas, 194.

In that case the bonds in question were issued under an order which upon its face showed that the purpose was to build a court house for Nolan County, but some of the bonds were in fact intended at the time to be, and were afterwards, applied to the payment of a debt contracted by the county in construction of a jail, for which latter purpose the law did not at that time authorize the county to issue bonds.    Each of the bonds contained the recital that it was issued for the purpose of building a court house, under the act of February 11, 1881, giving the title of the act.    This court, through Judge Gaines, said: "If a purchaser

were bound to inquire of the existence of the facts which empowered the court to issue bonds to build a court house and to know that the county had no court house, in view of the recitals upon the face of the obligation, he was bound to look no further.   He had the right to rely upon the truth of such recitals; having paid value for the bonds without actual knowledge of their illegality, the county will be estopped to set up that they were not issued for the purpose for which they purported to be issued."   Taking that part quoted by the Court of Civil Appeals from the opinion, disconnected from what precedes it, the conclusion of the Court of Civil Appeals might be reached; but considered in connection with the preceding sentence and with the facts upon which the opinion was based it is apparent that the court did not intend to hold that the purchaser would not be chargeable with notice of what appears on the face of the order under which such bonds were issued.   The facts recited, and of which the court was treating, were such as the Commissioners Court must determine, and which would not appear of record except as stated by the court upon the record or in the bonds.   The scope of that part of the opinion quoted by the Court of Civil Appeals is shown by the following extract from the same opinion:   "If, instead of being limited to the amount of taxable property as shown by the assessor's rolls, the Constitution had conferred upon the Commissioners Courts the power of determining that question for themselves, then according to the rule laid down in Marcy v. Oswego, supra, and recognized in the case of The Citizen's Bank v. Terrell, supra, their determination of the amount would have been conclusive, and would have precluded injury into the power to issue the bonds in so far as the question of amount is concerned.   But the power being limited as to the amount by the official assessment, the commissioners were not authorized to look beyond it and to determine the extent of their power from other data within their reach.   In such a case the rule established in Dixon County v. Field, 111 United States, 94, and acted upon in The Citizens Bank v. Terrell, applies."   The court was here treating of a fact of record, and announced the rule applicable to the facts of this case.   The Commisssioners Court can only authorize the issue of bonds by order entered of record.   Ball, Hutchins & Co. v. Presidio County, 88 Texas, 64.   The Commissioners Court of Mitchell County entered an order on its minutes on February 11, 1884, to the effect that bonds to the amount of $10,000 should be issued for the purpose of building and improving bridges and for opening and improving public roads of the said county, said bonds to bear eight per cent interest, and to run to the extent of the law, which was twenty years.   On the 28th day of August, 1884, the Commissioners Court made an order which was entered upon its minutes, "that a special fund be established as the cash fund, which shall be set apart for the purpose of meeting any demands against the county that must necessarily be paid in cash;" and directed the clerk of that court to issue four bonds upon the bridge fund for the sum of $500 each, to run twenty years, with eight per cent interest, to be sold and the funds trans-

ferred to the cash fund. In accordance with this direction the clerk issued bonds Nos. 10, 11, 12 and 13, under the order of February 11, 1884, which were sold and the funds used as directed. It is contended by the county that the purchaser of these four bonds was required to take notice of the order directing the clerk to issue them and prescribing the disposition of the proceeds. But we consider the latter order as simply a direction to' the officer of the county as to the manner in which the bonds should be disposed of and the funds applied, that it does not constitute the source of power or authority for issuing the bonds and the purchaser was not required to know the contents of that order. DeVoss v. City of Richmond, 18 Gratt., 338. ·

But the facts are very different as to the other bonds in question. The order above quoted, which authorized the issue of bridge bonds, was exhausted by the issue of the bonds numbered from 1 to 20; each bond being for $500, the twenty bonds make the full sum of $10,000 authorized by that order. The bonds from 21 to 26 inclusive were issued under the subsequent orders of the Commissioners Court, upon the face of which was expressed a purpose to use the bonds in the liquidation of the court house debt and other debts contracted by the county. On February 13, 1885, the court made an order that Martin, Byrne and Johnston be paid out of the bridge fund to be created by the sale of six bonds of $500 each, which were to be delivered to William Martin to make sale of them and pay the note due to the firm, paying the balance into the treasury; under which order the six bonds numbered 21 to 26 inclusive were issued. On May 14, 1885, the court made an order that bridge bonds be issued to Martin, Byrne and Johnston for the balance due them on the court house, when the amount can be ascertained, and subsequently, on June 25 of the same year, the court made another order that the road and bridge bonds ordered to be issued at a previous term of this court be issued and sold as directed in the minutes of that meeting. This evidently refers to the order of May 14, 1885, which directed that E. F. Swinney should sell the bonds. In the order of June 25, 1885, the court directed that thirty bonds for $500 each, being $15,000, be issued and sold as the law directs, for the purpose of raising a fund to pay off and discharge the balance due to Martin, Byrne and Johnston on the court house contract. Bridge bonds Nos. 34 to 37 inclusive and 60 and 61 were issued under this order.

From this state of facts it is evident that any person desiring to know the authority by which the bonds in question were issued and looking to the orders upon the minutes of the court under which the issue was made could not fail to see that the county commissioners had undertaken to evade the law by issuing road and bridge bonds for the purpose of constructing a court house. This they could not do by law, and the bonds, if in the hands of Martin, Byrne and Johnston, would undoubtedly be void. The only question with regard to these bonds is, was the defendant in error or any other purchaser for value without actual notice chargeable with a knowledge of the facts which might be ascertained

by the exercise of proper diligence and inquiry in the examination of the orders under which the bonds in question were issued. We think that this question has been settled definitely by the decision of this court in the case of Ball, Hutchins & Co. v. Presidio County, 88 Texas, 60, in which Judge Denman, for the court, used the following language: "It results from what has been said above, that the law requires a dealer in county bonds to know the provisions of the Act of the Legislature and the order of the County Commissioners Court under and by virtue of which such bonds were issued, whether referred to on the face of the bonds or not." As above stated, by an examination of the orders under which and by virtue of which alone the bonds could have been issued, the purchaser would necessarily have learned that the bonds were issued for a purpose not authorized by law, and, being so notified, would have received them with only the rights of the original payee. Having failed to take the precaution to examine the order upon which the bonds were based, the purchaser was guilty of negligence, and must be charged with notice of that which could have been learned in the exercise of ordinary care.

We therefore conclude, that the bridge bonds from 21 to 26 inclusive, and 34 to 37 inclusive, and 60 and 61, were invalid, that the plaintiff below had no right to recover against Mitchell County upon the coupons representing interest upon such bonds, and that the trial court and Court of Civil Appeals erred in holding said bonds to be valid, and in rendering judgment upon such coupons. All other bonds involved in this cause are found to be valid obligations of Mitchell County.

It is ordered that the judgments of the District Court and Court of Civil Appeals be reversed and this cause be remanded to the District Court.

*Reversed and remanded.*