LASATER et al. v. LOPEZ, County Treasurer, et al. (No. 6002.)

(Court of Civil Appeals of Texas. San Antonio. March 27, 1918. On Motion for Rehearing, May 8, 1918.)

1. COUNTIES ⊜149 — INDEBTEDNESS — RESTRICTIONS AND LIMITATIONS.

Const. art. 11, § 7, providing no debt for any purpose shall be incurred by a county unless provision is made at the time of creating the same for levying and collecting a sufficient tax to pay the interest thereon and provide at least 2 per cent. as a sinking fund, is a restriction and also a limitation on county debts, for, if unauthorized to levy a tax which could be used to pay the debt desired to be incurred, no power to incur it would exist.

2. COUNTIES &149—"DEBT"—RESTRICTIONS AND LIMITATIONS.

A sum contracted to be paid a contractor for work on roads, to be paid for in interest-bearing warrants, is a "debt" within Const. art. 11, § 7, restricting and limiting county debts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Debt.]

3. COUNTIES &164—INDEBTEDNESS—WARRANTS.

The commissioners' court of a county can, under Vernon's Sayles' Ann. Civ. St. 1914, art. 2241, subd. 8, empowering such court to settle and direct payment of accounts, issue interest-bearing warrants maturing annually in future years, limited only by Const. art. 11, § 7, in spite of articles 605–610, relating to bonds.

4. COUNTIES &164—"ESTABLISH" ROADS—POWERS OF COMMISSIONERS' COURT.

In view of other general statutes, Vernon's Sayles' Ann. Civ. St. 1914, art. 2241, providing that the commissioners' court can "establish" roads, empowers the commissioners' court of county which has not adopted article 6966 to build a road and create an indebtedness to be paid by interest-bearing warrants in future years, although a bond issue under articles 605–610 for such purpose has been voted down in an election; the latter act not taking away the power of the court in such respect.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Establish.]

5. HIGHWAYS &113(2)—BUILDING ROADS—CONTRACTS.

Vernon's Sayles' Ann. Civ. St. 1914, art. 6966, relating to road contracts, has no application to counties which have not adopted it by appointing a road superintendent.

6. COUNTIES &166—WARRANTS—"BONDS."

Instruments reciting that they are warrants issued to contractor for labor and material, and constituting orders upon the county treasurer to pay such contractor, and intended to be warrants, are simply warrants, and not "bonds," within statutes regulating issuance of bonds, although they are camouflaged by insertion of numerous provisions for the benefit of the holder, and they cannot be made negotiable by the commissioners' court.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bond.]

7. TRIAL &232(2)—SUBMISSION OF CASE.

Where the court submitted a case on special issues, it did not err in refusing to give a charge which would make the verdict one partly general and partly on special issues.

8. TRIAL &349(1)—SPECIAL ISSUES—SAVING OBJECTIONS.

Where facts are undisputed, no special issues relative thereto should be submitted, but motion should be made, asking the court to pronounce judgment required by law upon such undisputed facts.

9. HIGHWAYS &113(4)—DEBTS—POWERS OF COMMISSIONERS' COURT.

Although contract between commissioners' court and road contractor made estimates of a certain engineer binding, such court was not precluded from setting aside the estimate as grossly erroneous and unfair to the contractor.

On Motion for Rehearing.

10. HIGHWAYS &113(2)—IMPROVEMENT OF ROADS—CONTRACTS.

Statutes authorizing the use of road hands cannot be held to affect or limit the powers given by Vernon's Sayles' Ann. Civ. St. 1914, art. 2241, to the commissioners' court to improve roads by contract.

11. COUNTIES &149—ROADS—CONTRACTS—INDEBTEDNESS.

That the Legislature has provided means for procuring a road fund does not impliedly prohibit the commissioners' court from going into debt to build roads under Vernon's Sayles' Ann. Civ. St. 1914, art. 2241.

12. COUNTIES &23—IMPROVEMENTS—NECESSITY—COMMISSIONERS' COURT—POWERS—REVIEW BY COURTS.

Courts cannot go into the question of the necessity for improvements made by the commissioners' court, under Vernon's Sayles' Ann. Civ. St. 1914, art. 2241.

13. COUNTIES &166—BONDS—WARRANTS.

That warrants for county improvements recited that the work had been done did not add anything to them, or estop the county from the defense that it had not been done, or turn the warrants into bonds within statutes regulating their issuance.

Appeal from District Court, Jim Wells County; V. W. Taylor, Judge.

Suit by Ed. C. Lasater and other taxpayers of Duval County against Alonzo Lopez, county treasurer, and others, to have a road contract declared void and warrants canceled and their payment enjoined. Austin Bros., a corporation, intervened. Judgment for defendants, and intervener and plaintiffs appeal. Affirmed.

John C. North, of Corpus Christi, Geo. D. Anderson, of Beaumont, and Terrell & Terrell, of San Antonio, for appellants. L. Broeter, of Alice, W. M. Harris, of Dallas, and Hicks, Phelps, Dickson & Bobbitt, of San Antonio, for appellees.

MOURSUND, J. This suit was instituted on December 18, 1916, by Ed. C. Lasater and seven other taxpayers of Duval county against the county treasurer, Alonzo Lopez, A. W. Tobin, the county judge, G. A. Parr, the county commissioners then in office, and Marshall White. By amendment, the successors of said county commissioners were made parties. The object of the suit was to have declared void a certain road contract of Duval county with Marshall White, and to procure the cancellation of all warrants issued by the county in payment for work done under said contract, and in the alternative that said warrants be canceled to the extent of their alleged illegality, and also for an injunction against the county treasurer to prevent him from paying said warrants or any interest upon them. Austin Bros., a corporation, as the holder of $5,230 worth of such bonds, intervened, and the defendants duly answered. The petition is lengthy, and contained allegations of fraud, as well as attacks upon the legality of the contract and proceedings of the court. The jury found in favor of defendants and intervener upon all issues submitted to them, and judgment was rendered, declaring the warrants valid, and that plaintiffs take nothing by their suit. The plaintiffs in their motion for new trial confined themselves to

&For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

certain specifications of error, and it will not be necessary, for the purpose of disposing of the same, to give a full statement of the pleadings. A short statement of the facts deemed material to the disposition of the assignments of error has been filed. The pleadings justified proof of such facts, and raised the issues presented in appellants' assignments of error. Should it become necessary to consider the pleadings further, it will be done in discussing the assignments.

The undisputed facts material upon this appeal, quoting from the statement of facts, are as follows:

"On September 13, 1915, the commissioners' court of Duval county, without advertising for, or receiving, bids, entered into a contract with Marshall White to construct and repair certain roads and bridges in Duval county, Tex., and agreed to pay him therefor $60,000 in warrants of said county. At the time of the making of the contract and at no time since its execution has there been enough money in the treasury of said county to pay the costs of the construction of said roads, or any considerable part thereof, nor was it contemplated by the parties to the contract that any part of the contract price should be paid in cash when the roads were completed. The warrants were for $500 each, payable in yearly installments extending over a period of 16½ years, and attached to the warrants were interest coupons representing the semiannual interest at 6 per cent. No election was held to determine whether or not the indebtedness should be created either in the form of warrants or bonds, or to determine which roads should be constructed or which bridges built.

"The contract provided that the warrants should be issued upon the approval of estimates of the engineer as the work progressed; the article X thereof provided: 'It is further agreed that the contractor shall have the right to sell, assign and transfer to any person, firm or corporation any and all of the warrants herein provided for upon their delivery to the contractor, and also sell, assign and transfer all claims, rights, demands and liens against the county of Duval, arising out of and accruing by virtue of this contract and all of such rights shall be exercised by the owners of said warrants. The delivery of said warrants or any of them to the contractor, his assigns, or transfers, shall in their hands, or the holder of any of said warrants for value be conclusive evidence of the performance by the contractor of the proportionate part of his entire obligation under this contract, as represented by the amount of warrants so delivered, and the said delivery of said warrants shall be a waiver by the county and county officials of all defense of whatsoever nature which said county, or officials, or other persons may interpose to the payment of any of said warrants, or the county's right to levy a sufficient tax and make sufficient appropriation for the payment of the same, and said county declares and agrees that when said warrants are issued and delivered to the contractor, the same shall be in every way valid and binding obligations on the county, and special revenue created and pledged for their payment.' "

"The contract further provided that the debt should always be regarded as a general obligation upon the county, and a first lien upon the road and bridge fund, and the county agreed not to levy or appropriate any part of said tax for any other purpose until a sufficient amount thereof should have been first levied and appropriated in each year for the payment of said warrants and interest, and also agreed that the warrants might be paid out of

202 S.W.—66

the general fund not otherwise appropriated. The warrants were payable at the option of the holder at the Hanover National Bank in New York, and provided: 'That all or any part of said warrants should be receivable for all dues and taxes as provided by law; by the terms of said contract it was further provided that in the event of litigation the county of Duval agreed to hold the owners of said warrants harmless as well as the contractor, and agreed to pay a reasonable attorney's fee to the respective holders of such warrants, and to pay all costs of suit.'

"The commissioners' court, without any election to authorize it, levied for the years 1915 to 1932, inclusive, and for each succeeding year during which any of the principal or interest warrants might be outstanding and unpaid, a direct, continuing annual tax. At the time the contract was entered into J. B. Stewart was appointed county engineer of Duval county to take charge of said work and make estimates on behalf of said county. Marshall White began work under said contract, and had performed a large part thereon when on January 1, 1916, by mutual agreement, the amount of work to be done thereunder was reduced from $60,000 to $25,000, and a supplemental contract was entered into to that effect by the commissioners' court and Marshall White, dated January 1, 1916, which contract provided for a reduction of some of the prices fixed in the original contract and that all warrants provided for in the original contract, except Nos. 1 to 50, should be surrendered, canceled, and destroyed, and it was agreed that Fred M. Percival should be the supervising engineer in charge of said work; that his estimates should govern; that the estimates previously allowed were subject to correction and revision by said Percival, and that the contractor should abide by his measurements, and that the price provided for in said contract should be reduced and should apply to all work previously done, as well as to the work to be done thereafter, and that Percival's estimate of all work previously done should govern as well as to all work thereafter.

"On or about February 15, 1916, Fred M. Percival presented to the commissioners' court an estimate for all work done under the original contract and the supplemental contract up to that date, of $16,360.89, and Marshall White disputed said estimate, and contended that the amount of work done up to that time under the prices fixed by the supplemental contract amounted to $25,000, and a hearing of the contested matter came before a new commissioners' court, which had been appointed by the district judge, in the place of the four commissioners who had originally made the contract, they having been removed from office by reason of certain charges filed against them, and the new commissioners' court heard evidence on said issue, and called in J. B. Stewart, who was still acting as county engineer, to give testimony in regard to the amount of work done, and upon a full hearing of the matter Fred M. Percival increased his estimate to $18,931.83, stating that he did so in a spirit of compromise and to avoid litigation, but not conceding error, but White refused to accept same as a correct estimate, and still contended that he had done $25,000 of work, and in the hearing it developed that J. B. Stewart had been on the work at all times since it had been begun by Marshall White, and that Percival had only seen the work after 65 per cent. of it had been done, and White contended that Percival could not know the quantities which had been handled by him for that reason. After a full hearing on February 15th, the commissioners' court approved the estimate of J. B. Stewart as the correct estimate of the amount of work done, Stewart's figures being $25,000, and the commissioners ordered the balance of the warrants to the extent of $25,000 to be delivered to Marshall

White, and they were delivered, but after their delivery to him a part of them were transferred to the intervener herein, Austin Bros., a corporation organized under the laws of the state of Texas, having its principal office and domicile in Dallas, Dallas county, Tex. No bridges were built or repaired under said contract.

"The taxable values of Duval county and the unappropriated amount of tax which could be levied for road and bridge purposes under the law were amply sufficient to permit the commissioners' court to issue $60,000 of warrants for road and bridge purposes at the time the original and supplemental contracts hereinbefore mentioned were made, provided said warrants could be legally issued."

The contract and supplemental contract between White and the commissioners' court were made a part of the statement of facts, and one of the warrants, which had been paid, was attached to and made part of the statement of facts. The contracts bound White to provide material and do work in constructing and repairing roads and bridges in Duval county to be designated by the commissioners' court. The specifications of the nature of the work to be done show that the object of the contract was to improve the roads by grading the same, construction of culverts and repair and construction of bridges. In fact, no bridges were built or repaired under the contract. Was the commissioners' court authorized to incur indebtedness for the purpose and to the extent provided in the contract as finally made with White, and to issue, as evidence of the indebtedness, the instruments therein stipulated for?

[1-3] In section 7, art. 11, of the Constitution it is provided that no debt for any purpose shall be incurred by a county unless provision is made at the time of creating the same for levying and collecting a sufficient tax to pay the interest thereon and provide at least 2 per cent. as a sinking fund. This is a restriction and also a limitation, for if unauthorized to levy a tax which could be used to pay the debt desired to be incurred no power to incur it would exist. The meaning of the term, "debt," as thus used has been explained in the case of McNeal v. Waco, 89 Tex. 83, 33 S. W. 322, and other cases. The sum contracted to be paid White was a debt within the meaning of such constitutional provision, and the court complied with such provision at the time it created the debt. The framers of the Constitution did not see proper to prescribe any other limit to the indebtedness of counties or to prescribe any method for evidencing the indebtedness. The Constitution (section 18, art. 5) created a tribunal to be known as the "county commissioners' court" which should "exercise such powers and jurisdiction over all county business" as is conferred by the Constitution and laws of the state. The Constitution left it to the Legislature to define the powers of such court with respect to the ordinary affairs of the county, including the creation of debts. The Legislature in article 2241, subdivision 8 (Vernon's Sayles' R. S.) empowered such court "to audit and settle all accounts against the county and direct their payment." This provision had its inception in the act of March 16, 1848 (Acts 2d Leg. c. 98), creating "the county court," and the language contained in said subdivision 8 was originally followed by the words "in such manner and at such times as may meet the public interest." In the act of July 22, 1876 (Acts 15th Leg. c. 55), organizing commissioners' courts, the provision was first written as it is now expressed in said subdivision 8. In the case of San Patricio County v. McClane, 58 Tex. 243, construing the act of 1848, it was held that the "county court," being authorized to provide courthouses and jails, and to audit and settle all county accounts, and direct their payment in such manner and at such times as may meet the public interest, had the power to issue interest-bearing warrants to a contractor for building a courthouse and jail. In the case of Davis v. Burney, 58 Tex. 364, the same court held that interest-bearing warrants for refunding prior indebtedness issued under order of the commissioners' court in 1878 were valid. The court discussed at length the power of commissioners' courts, calling attention to the rule that municipal corporations can only exercise such powers as are expressly given by legislative act and such implied powers as are necessary to carry into effect those expressly granted, and stating that by explicit legislative enactments the power is conferred on commissioners' courts to audit and allow claims against the county, and to provide the means by way of taxation to pay same. The fact that the provision considered in the case of San Patricio County v. McClane expressly stated that the court could direct the payment "in such manner and at such times as may meet the public interest" does not affect the authoritative value of the opinion in this case, for the provision considered in the Davis v. Burney Case, and now constituting said subdivision 8 of article 2241, must be given the same construction, for the power to audit and settle necessarily implies the power to fix the time for payment. The cases discussed have been followed by many others, and it is well established that the commissioners' court has the power to incur indebtedness, not only to the extent of the revenues of the county during the terms of office of such commissioners, but also to the extent of contracting away revenues which will be collected during many years, and to evidence the indebtedness by interest-bearing warrants. Mitchell County v. Bank, 91 Tex. 361, 43 S. W. 880; Ault v. Hill County, 102 Tex. 336, 116 S. W. 359; Stratton v. Commissioners' Court of Kinney County, 137 S. W. 1170;

Allen v. Abernethy, 151 S. W. 348; Rogers' Bank v. Marion County, 181 S. W. 884; Broussard v. Wilson, 183 S. W. 814; Brazeale v. Strength, 196 S. W. 247.

It is also established by the Stratton v. Commissioners' Court Case that such power, in so far as it relates to building courthouses, is not affected by articles 605 and 610 (Vernon's Sayles' Statutes), relating to the issuance of bonds for certain purposes, including the erection of a courthouse and improving and maintaining public roads. This holding is based on the proposition that the acts relating to issuance of bonds are not so worded as to expressly or by implication limit the court to the use of bonds in making the improvements mentioned in the bond laws. The acts were passed to supply a power held in the case of Robertson v. Breedlove, 61 Tex. 318, not to exist by implication, and not for the purpose of affecting any powers which had been granted to the court. The Legislature did not authorize the issuance of bonds for the improvement and maintenance of public roads until April 28, 1903 (Acts 28th Leg. [1st Called Sess.] c. 4), and when it did so, no attempt was made to abrogate powers then existing. It follows that if the commissioners' court was authorized by other laws to improve the public roads by contract, it had the power to issue warrants to evidence the indebtedness, and such power was not affected by the passage of the act authorizing the same purpose to be accomplished by means of a bond issue. Had there been statutes forbidding the commissioners' court to issue warrants except to the extent of the current revenues for the year, the court would perhaps have held in the Breedlove Case that the power to issue bonds was necessarily implied from the provision directing the erection of courthouses. In appellants' brief the doctrine that the commissioners' court can accomplish by means of warrants what the voters have refused to permit them to accomplish by means of a bond issue is assailed in a very forceful manner. The only answer we can make is that it is a matter which should address itself to the Legislature. It may be that debts which will exhaust the revenues for years to come should only be created by bond issues, but the Legislature has not seen fit to say so, and it has had many opportunities to do so, since it has been authoritatively established that the laws did not so provide.

[4] As it is within the power of commissioners' courts to issue interest-bearing warrants maturing annually for many years to evidence indebtedness legally created, it remains only to be determined whether the court was authorized by law to incur the indebtedness to White, and whether the instruments delivered to him constitute warrants. The Constitution in article 11, § 2, provides that "the laying out, construction and re-pairing of county roads, shall be provided for by general laws," and in article 16, § 24, directs that the Legislature shall make provision for working public roads, for the building of bridges, and for utilizing fines, forfeitures, and convict labor to all these purposes. In article 8, § 9, a tax of not exceeding 15 cents for roads and bridges is authorized, and by amendment to said section it was provided that the Legislature may authorize an additional tax not exceeding 15 cents for the further maintenance of the public roads, and that the Legislature may pass local laws for the maintenance of the public roads and highways. It is interesting to note, in this connection, that the tax of 15 cents authorized by the Constitution for roads and bridges is not a current tax for maintenance purposes, and may therefore be used to be applied to the principal and interest of a debt. Dodenheim v. Lightfoot, 103 Tex. 639, 132 S. W. 468.

The Legislature passed the necessary laws to give effect to the tax provisions, and passed many laws relating to the public roads. In article 2241, which constitutes the general grant of power to the commissioners' court, it is provided that said courts shall have power, and it is their duty, "to lay out and establish, change and discontinue public roads"; "to build bridges and keep the same in repair"; and "to exercise general control and superintendence over all roads, highways, ferries and bridges in their counties." The controversy in the briefs relates chiefly to the proper construction to be given to the words, "lay out and establish," appellants contending that no power is therein given to "build" roads, while appellees contend it would be wrong to restrict the word, "establish," to a meaning which would only authorize the designation of a road on a map and the making of an order stating that it was established. We think it is clear that the word, "establish," should be construed to mean "make, create or found permanently." Macdonell v. Railway, 60 Tex. 590. In the cited case the court had under consideration the charter power of a city to establish ferries, and stated that the power to establish ferries carries with it the power to do all such acts as may be necessary to construct permanent ferries. In this connection it is interesting to note that the language, "lay out and establish, change and discontinue public roads and highways," now found in article 2241, was first used in the act of May 13, 1846 (Acts 1st Leg. p. 333) and that in the same act the county court was empowered to "establish ferries and the rates of tolls to be charged at such ferries." This language was afterwards changed to read, "To establish public ferries wherever the public interest may require" (Rev. Civ. St. 1911, art. 2241), and this court in the case of Burrows v. Gonzales County, 5 Tex. Civ. App. 232, 23 S. W. 829, held that such language gave the

power "to create and operate a public ferry" while the Supreme Court, in the case of Tugwell & Madison v. Ferry Co., 74 Tex. 480, 9 S. W. 120, 13 S. W. 654, held that such language gave a grant as full as the Legislature could make it. It is true that the word, "establish," is sometimes used to express the effect of an order of the court declaring certain described right of way to be a public road, but as roads are intended to have permanency and it is one of the functions of government to establish and maintain the same, the grant by the state to the commissioners' courts to establish the same should be held to be as full as the Legislature could make it, and to carry the power, not only to create roads by passing the necessary orders and removing obstructions and doing other work so as to make the road fit for use, but also to keep up and improve the roads. In other words, to do all such acts as may be necessary to construct permanent roads. It is also perhaps worthy of mention that if the statutes are to be liberally construed, as provided in section 3 of the Final Title, Statutes of 1911, with a view to effect their objects, the power given the commissioners' court in article 2241 should be construed to be a substantial one, such as would authorize that body to provide and maintain good roads. Our statutes relating specially to roads tend strongly to show that the duty imposed and power granted by article 2241 should be construed as we have herein construed it, and in themselves constitute a grant of power to the commissioners' court to improve the roads.

Article 6872 provides for clearing roads, and that all causeways shall be at least 16 feet wide. Article 6884 authorizes the court to establish and classify roads and order the opening out of the same. Article 6901 provides that the county commissioners shall supervise roads and make reports stating what bridges, culverts, or other improvements are necessary to place the roads in good condition and the probable cost thereof, which reports are to be spread on the minutes of the court to be considered in improving public roads and determining the amount of taxes levied therefor. Article 6903 provides that such reports, together with all contracts made by said court for any work on any road, shall be submitted to the grand jury. Article 6919, makes it the duty of certain male persons "to work on, repair and clean out the public roads," and article 6923 provides that such persons may purchase exemption at the rate of $1 per day. Article 6928 authorizes overseers to call out hands at such time as may be deemed best by commissioners' court "for the better improvement of the public roads." Articles 6934 and 6935 provide for taking timber and earth for building bridges and causeways, and for cutting ditches to drain water from roads. Article 6936 authorizes overseers to exchange labor of hands for use of wagons, plows, or scrapers and necessary teams. Article 6901 requires overseers to apply money coming into their hands to the improvement of their roads in an impartial manner by repairing or building bridges, hiring hands or teams, or in such other manner as they may deem best. Article 6944 provides that all moneys appropriated by law, or by order of the commissioners' court, for working public roads or building bridges, shall be expended under the order of the court, except when otherwise provided by law. Article 6949, referred to by appellants in their brief, prescribes the duty of the court in expending the road and bridge fund, and stipulates that in expending money "in building permanent roads" the same shall be used only on certain roads. Article 6950 authorizes the court to make rules and orders for working and repairing roads and to utilize money to be expended thereon, not in conflict with law, and to purchase or hire all necessary road machinery, tools, or teams and such labor as may be needed in addition to the labor required of citizens "to build or repair the roads." The last-mentioned two articles are part of an act authorizing the appointment of road commissioners and further defining the powers and duties of the commissioners' court. Acts 1889, p. 134.

These provisions were in force prior to the passage of the law authorizing the issuance of bonds for road improvements, and at the time the contract was made with White. The commissioners' court, being invested with the duty and power to create and maintain adequate roads, could legally contract for the work and material embraced in the contract with White, and having, in the discretion vested in it by law, determined that it was necessary to make improvements to such an extent as to require it to fasten an indebtedness upon the county, it could legally do so and issue warrants to evidence the same; there being no statute which expressly or by implication limited such court to the making of improvements which could be paid for by current revenues.

[5] Appellants quote article 6966. Said article is part of an act which only applies in counties which adopt it by appointing a road superintendent, and has no application in determining the power vested in the commissioners' court of Duval county, and the article is only referred to by appellants for the purpose of deducing therefrom a legislative opinion that the power to construct and improve roads by contract had not theretofore been given. It has no value for such purpose in view of other articles which clearly give such power, and, even if there was doubt, would be of little value, for the Legislature frequently passes laws that are simply declaratory of the law as it already exists under other statutes or the common law. Von Rosenberg v. Lovett, 173 S. W. 508.

[6] The next question is whether the instruments issued to White are warrants or bonds. The instrument in evidence is designated on its face as "Road and Bridge Warrant Certificate," and in the body of the instrument it is continually referred to as a "warrant." It recites the county's indebtedness to Marshall White, contractor, in the sum of $500, and orders the treasurer of the county to pay such sum to Marshall White, his assigns or bearer, and is signed "County of Duval, Texas, by G. A. Parr, County Judge," and attested by the clerk. There is no doubt that it was sought to make the instrument appear attractive to buyers of securities, by giving it an imposing appearance, and inserting numerous provisions for the benefit of the holder, as well as representations that the labor had been performed and material furnished for which the instrument had been issued. However, it is after all only a warrant, and no amount of camouflaging can make it anything else. It is subject to defenses by the county, as was pointed out in the case of Allen v. Abernathy, supra, and any attempt on the part of the commissioners' court to make it negotiable is futile and void. In the case of City of Tyler v. Jester & Co., 97 Tex. 344, 78 S. W. 1058, the court was called on to determine whether the city had issued notes or bonds. It had the power to issue either. The court mentioned that the obligations recited that they were notes, and said:

"The obligations in suit have some of the characteristics of bonds, but they are more like promissory notes. It is evident that the parties to this transaction intended to issue notes, and, having power to do so, their intention must be given effect. The instruments are not bonds within the meaning of the statutes regulating the issuing of bonds."

The instruments involved in this suit recite that they are warrants issued to a contractor for labor and material; they constitute orders upon the treasurer to pay such contractor, each being due at a different date; they are not bonds within the meaning of our statutes relating to the issuance of bonds. There is no ground for holding them to be bonds. Graves v. O'Neil, 189 S. W. 778.

[7] It is further contended that the court erred in refusing to instruct the jury that the commissioners' court was required to settle with White on the estimate of Percival, and, having failed to do so, the payment of White to the extent of the excess over Percival's estimate was unauthorized, and to find the warrants to the amount of the difference between Percival's estimate and $25,000 were illegally issued to White. The court submitted the case on special issues, and did not err in refusing to give a charge which would have made the verdict one partly general and partly on special issues. Dallas Hotel Co. v. Fox, 196 S. W. 652; Calvin v. Neel, 191 S. W. 791.

[8, 9] If the facts are undisputed, no special issues relative thereto should be submitted, but by proper motion the court should be asked to pronounce the judgment required by law upon such undisputed facts. We are of the opinion, however, that if the question could be held to have been properly raised, we would be compelled to overrule the contention that plaintiffs are entitled to have the bonds enjoined to the extent of the difference between $25,000 and Percival's estimate. Appellants' theory is that the commissioners' court could legally contract to make Percival's estimate binding upon the county, but that it could not legally agree to relinquish any rights it might have by reason of the estimate having been made, and that, regardless of the fact that Stewart's estimate was correct, and its correctness established by verdict of the jury in this case, the court should have set aside the judgment of the commissioners' court to the effect that the county was indebted to White in the sum of $25,000, and have declared the warrants void to the extent of the difference between Percival's estimate and the sum of $25,000. In other words, that the county by virtue of the estimate became entitled to exact from White work to the extent of the difference between Percival's estimate of $16,360.89 and $25,000, even though he had already furnished work to the extent of $25,000, and that the action of the commissioners' court in entering a judgment which released White from the furnishing of the $8,639.11 worth of work was void. The matter of the estimate was inseparably connected with White's claim. The agreement for such estimate was part of the contract, and the law reads into the contract the proposition that no estimate made by an arbitrator can stand if it be shown that such gross mistake was made as to necessarily imply bad faith, or a failure to exercise an honest judgment. The court had jurisdiction to pass on White's claim and in doing so to pass upon his attack upon the estimate. It heard evidence, and became convinced that White had a legal claim against the county for $25,000. It was not required to subject the county to the expense of a suit it could not win. In passing upon all claims it has a discretion to determine the correctness thereof. In this case the jury found there was no fraud, and that in fact there was a mistake in Percival's estimate, which undoubtedly would be characterized as a gross mistake. If the district court under the supervisory powers granted it with respect to proceedings of the commissioners' court was authorized to investigate its judgment on this matter, it is clear that the facts fail to show such abuse of discretion as would justify the district court in setting aside the judgment.

The judgment is affirmed.

### On Motion for Rehearing.

The first part of our opinion was devoted to the power of the commissioners' court

with respect to fixing the time of payment of debt and issuing interest-bearing warrants to evidence the same, and not to the power of the court to incur indebtedness. Appellants construe our opinion as virtually holding that the power "to audit and settle accounts and direct their payment" gave unlimited power to incur indebtedness. We trust the opinion is not subject to that construction, for we intended to clearly separate the discussion of the two questions, one relating to the power of the court, in cases where it was legally authorized to incur indebtedness, to evidence the indebtedness by interest-bearing warrants maturing throughout a long series of years, and the other, the power of the court to incur indebtedness for road improvements.

The cases of McClane v. San Patricio County and Davis v. Burney were relied upon as pioneer cases on the subject of warrants, and, together with the other cases cited in the first part of our opinion, were believed sufficient to establish the proposition that, if the court had the power to incur indebtedness for road improvements to the extent of the contract with White, it had the power to issue the warrants involved in this suit. We do not regard appellants' discussion of the McClane v. San Patricio County Case as accurately stating the issues or effect of the decision, but regard it unnecessary to further discuss the first question above stated, except in so far as it is necessarily involved in the discussion of the courthouse cases, which we believe have a material bearing on both questions.

Appellants state that they think the court had power to issue warrants to build courthouses and jails before the passage of the act of 1881 (Acts 17th Leg. c. 9), authorizing issuance of bonds, but that they had no such power thereafter, and state that no court ever so held prior to the decision in the Stratton Case. In the case of Cresswell v. Roberts County, 27 S. W. 737, in which a writ of error was denied, the court held that the bond legislation was intended to confer on the court an additional power, and not to take away, by substitution or otherwise, that which already existed. The case did not involve the validity of warrants, but it is significant that the court construed the original bond statutes just as they have been construed in the Stratton Case. Before passing to the Stratton Case, appellants discuss the case of Allen v. Abernethy, 151 S. W. 348, decided by this court, and indulge in the following vigorous criticism:

"That any court should ever hold that, after an election has been held to determine whether or not bonds shall be issued to build a courthouse, and their issuance defeated, the commissioners' court could, within one month thereafter, issue warrants for the very same purpose, and in a greater amount, is to us almost unbelievable, and that such is the law is to us unthinkable."

The theory thus advanced by appellants is without merit. It amounts to a contention that, even though the bond laws do not take any power from the commissioners' court to build a courthouse and issue warrants in payment, still if the court submits to the voters a bond proposition, and the same is voted down, then the court has no power to build a courthouse and issue warrants to pay for same. The vote of the people did not change the rules of law applicable to the power of the court, and if the cases of Stratton v. Commissioners' Court and Cowan v. Dupree, 139 S. W. 887, are correctly decided, and the Supreme Court refused writs of error in both, then the decision in the case of Allen v. Abernethy is undoubtedly correct.

Appellants take issue with us in regard to what we said concerning the purpose for which the bond laws were passed, and contend that they were passed "for the express purpose of curbing the power which has arisen under the decisions of courts." As the courts had held that the commissioners' court had no power to issue bonds unless expressly authorized by statutes, it is evident that when the statutes authorizing the issuance of bonds were passed, the purpose was not to curb any power which had arisen under decisions of the courts. When the subsequent laws were passed which regulated and restricted the issuance of bonds, the purpose might be said to have been to curb the commissioners' court in the exercise of the power given by the previous statutes, but if there was any intention to curb any powers other than the one to issue bonds, the Legislature wholly failed to express such intention. In fact, appellants' contention, as stated further on, is that the original statutes authorizing the issuance of bonds by implication restrict the commissioners' court to the use of bonds to derive the necessary funds to build courthouses, when there is not sufficient cash on hand, and thus impliedly prohibit the commissioners' court from making a contract unless a bond issue has been voted. They say that:

"Where the statute directs the performance of certain things in a particular manner it forbids by implication every other manner of performance."

That principle has no application to our bond statutes. They are obviously intended to supply a power held not to exist, and not to forbid the court from exercising powers then existing. The Legislature did not provide that the question whether a contract for a courthouse should be entered into should be submitted to the voters, as well as whether bonds should issue, as it did in article 2253 with reference to certain bridges.

In their attack on the Stratton Case appellants undertake to show that the case of Mitchell County v. Bank, 91 Tex. 361, 43 S. W. 880, cited in the Stratton Case, instead of being authority supporting the decision, is really authority adverse thereto. Mr. Justice Brown, who wrote the opinion of the

court in the Mitchell v. Bank Case, was a member of the court when it refused the application for writs of error in the Stratton and Dupree Cases, and was in a better position than any one else to determine whether the decisions in said cases were in accord with the decisions of the Supreme Court. The particular portion of the opinion in the Mitchell v. Bank Case relied on by appellants is the following sentence:

"It is quite too plain for argument that if the laws of 1881 and 1884, or similar laws, had never been passed, Mitchell county would have had no authority under the Constitution to contract the debts represented by the bonds, nor to levy a tax for the payment of the interest and sinking fund on such debt; the power to do so could be derived from the Legislature only."

When the sentence is read in connection with its context, and it is borne in mind that the court was discussing bonds, payable to bearer, issued for the purpose of raising money, it is evident that by the words, "contract the debts represented by the bonds," the court meant that in the absence of the bond statutes the county could not borrow money and issue negotiable instruments to evidence the debt thus incurred, and that it had no reference to a debt incurred by making a contract with some one to erect a courthouse.

We are convinced that the courthouse cases were correctly decided. They establish the following propositions: (1) That the power to provide courthouses includes the power to go in debt for the purpose, not exceeding the constitutional limit. (2) That interest-bearing warrants, issued pursuant to the contract with the contractor, evidencing the debt thus incurred, even though payable during a long series of years, are valid. (3) That the laws authorizing the issuance of bonds are not a limitation upon the power of the commissioners' court to incur an indebtedness for the purpose of building a courthouse, but confer power to raise funds by borrowing money on the credit of the county and issuing negotiable paper to evidence the debt thus created.

We pass now to the question of the power of the commissioners' court with reference to roads. Appellants say in their motion:

"The commissioners' courts were authorized to improve public roads by contract, but the amount which they could spend was limited and properly so. They had the right to use any revenue on hand for the purpose, but even then they were required to let the contract to the lowest responsible bidder, and require a bond. Not so in the case of warrants. If they used cash, the law required that the contract should be let to the lowest bidder and a bond required, while in this case the court holds that, if they were building roads on a credit, they could dispense with such senseless formality."

This statement is not supported by any reference to the statute, and the brief of appellants contains no reference to any statute which might be construed as so providing except article 6966, R. S. 1911, which is part of a law applying only to counties which adopt it by appointing road superintendents in accordance with its provisions. That law has never been adopted in Duval county, and has no application to this case. If there is a similar statute which applies to the state generally, it has not been pointed out, and we have not found it. The references thereto do not serve to aid in deciding the question at issue, but, on the contrary, tend to confuse.

[10] The statutes which do apply to this case have been referred to in our original opinion. As appellants have failed to point out others, we may assume that we have considered those which are material. We have pointed out the constitutional provision which prohibits the incurring of debts beyond the boundaries marked out by the taxing power, and appellants admit that such provision has been complied with. There is no statute which states that commissioners' courts cannot go in debt to build roads, or which makes further restrictions than the one made in the Constitution, and there is no statute which expressly authorizes the court to incur debts for such purpose. There are only the statutes which make it the duty of the court to establish roads and which authorize the court to improve roads by the use of road hands or by contract. The statutes authorizing the use of road hands cannot be held to affect or limit the powers given to improve roads by contract. There is, as stated, no statute expressly limiting contracts to funds on hand, or funds to be derived during the current year. There is no statute which by implication creates such a limit, unless it be statutes which provide a fund. Such statutes contain no statement from which such limit can be implied, and therefore, if deducible, it must be based on the mere creation of the road and bridge fund.

[11, 12] Can it be held that because the Legislature has provided means for procuring a road fund, it impliedly prohibited the commissioners' court from going in debt, that is, contracting for improvements in excess of the amount of money to be derived for road purposes during the current year? If so, then it must be held broadly that the commissioners' court has no power to contract debts, for the law authorizes the collection of funds to be applied in carrying out all the powers of the court, the exercise of which involves the expenditure of money. If it can be held that there is no power to incur debts, the decisions in the courthouse cases are wrong, and it should be held that courthouses must be built with cash on hand, and the taxes to be collected during the current year, or else by money derived from a bond issue. We are unable to see any sufficient ground for holding that a different rule applies with reference to incurring debts for roads than for courthouses. We do not believe the courts can go into the question of the necessity for making the improvements without invading

the discretion vested in the commissioners' courts; and therefore no distinction between the courthouse cases and this case can be predicated upon a theory that there may be a greater necessity for the exercise of the power as to courthouses than as to roads.

[13] In the argument it is contended, as a reason for holding the instruments issued by Duval county to be bonds, that the county, after having recited that the work had been done, could not make the defense that it had not; and it would be immaterial to the holder of the instruments whether or not the work had been done if the warrants recited that it had. In other words, the theory is that the commissioners' court made the warrants incontestable on the theory of estoppel, and therefore they became just as good as bonds, and therefore should be held to be bonds. The case of Nolan County v. State, 83 Tex. 183, 17 S. W. 823, is relied on. That was a case relating to recitals in bonds. We call attention to Mr. Dillon's discussion of warrants in sections 856 and 857, in fifth edition of his work on Municipal Corporations. The order of the court for the issuance of warrants contains, expressly or impliedly, a finding that the work has been done for which the warrants are issued. If this judicial determination is insufficient to protect a purchaser of warrants, it is inconceivable that a recital that the work has been done, made in the warrant, would enlarge his rights.

We see no reason for changing our conclusion that the instruments issued are warrants.

The motion for rehearing is overruled.