The ROBERT DRISCOLL AND JULIA DRISCOLL AND ROBERT DRISCOLL, JR. FOUNDATION, Appellants,

v.

NUECES COUNTY et al., Appellees.

No. 7076.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 4, 1969.

Rehearing Denied Sept. 25, 1969.

R. Kinnan Goleman, Corpus Christi, for appellants.

Franklin Smith, County Atty., I. M. Singer, City Atty., Charles N. Cartwright, Corpus Christi, for appellees.

KEITH, Justice.

The appeal is from a judgment denying appellants an "agricultural use" designation for ad valorem tax purposes of certain lands in Nueces County, Texas, sought under the provisions of Article VIII, § 1–d, of the Constitution of the State of Texas, added as an amendment on November 8, 1966, Vernon's Ann.St. The years involved are 1967 and 1968. Following unfavorable jury findings, the trial court upheld the denial of the designation and the appeal has been duly perfected.[1] The case is one of first impression.

1. Before the case was transferred to this Court by order of the Supreme Court, appellees had filed a motion to dismiss the appeal because of an asserted inadequacy of the cash deposit in lieu of an appeal bond filed by appellants under Rule 354, Texas Rules of Civil Procedure. The Court of Civil Appeals at Corpus Christi, prior to the transfer, overruled the motion to dismiss the appeal, permitted the appellants to file an appeal bond, and such was done. We concur in and approve this action by the Corpus Christi Court and now adopt it as our own, thereby preserving the rights, if any, of appellees to complain of our refusal to dismiss the appeal.

"The Robert Driscoll and Julia Driscoll and Robert Driscoll, Jr., Foundation", (hereinafter referred to as "Foundation"), was created by a testamentary trust in the will of the late Clara Driscoll. Decedent's residuary estate was bequeathed to three trustees who were directed to create an endowment for the purpose of establishing and operating a children's hospital and clinic for the free treatment of indigent, crippled, maimed or diseased children in Nueces County and surrounding counties in Texas. The hospital had been established and has been in operation at all times material to this suit. All of the income of the Trustees from the trust estate property, approximately a million dollars per annum, was being expended upon the operation of the hospital. The hospital was operated by a Board of Trustees appointed by the Foundation Trustees.

It appears from the record that the business affairs of the Foundation were conducted by an executive secretary who also served as an accountant, a farm and ranch manager, and a secretary. The Foundation neither owned any farming machinery, employed any farm laborers, nor actually engaged in tilling the soil except as the landlord under share-crop rental leases with a particular tenant. The Trustees owned approximately 103,000 acres of farm and ranch land situated in Nueces County and in several counties adjacent thereto. All of the farming land, approximately 8,500 acres, is in Nueces County and is under a single share-crop rental lease. This farming land, as well as most of the ranch land owned by the Trustees, was under lease for oil and gas and there was a substantial amount of income from production upon the lands of the Trustees.

The Trustees also owned substantial blocks of stocks, bonds, a hotel, an office building, and various other properties which produced income applied to the operation of the hospital.

Within the time and manner provided by the Constitutional Amendment, the Trustees caused to be filed with the several tax assessors of the various political subdivisions [2] their sworn statements "describing the use to which the land is devoted." [Constitution, Article VIII, § 1-d, subsection (b)]. The statements were each substantially the same except only the one submitted to the Nueces County assessor contained *all* of the agricultural land for which claim was made, the others included only the specific acreage which was situated within the geographical limits of the respective taxing units. No serious question is raised as to the form or sufficiency of the statements, except the taxing agencies raise some questions as to the effect of the answer to question of the "Primary Occupation" of the owners, i. e., the Trustees, which was answered: "To provide hospital care for indigent children." To this we will return.

The facts presented are common to each of the taxing agencies, except for variations in acreage, tax rates, ratios of assessment to actual value, amount of taxes involved, etc., so that an illustration of the procedures followed with West Oso Independent School District will serve to explain this facet of the case as applicable to all of the agencies. The blank in the printed form for natural owner was filled in by inserting this typewritten material: "Dr. McIver Furman, W. Preston Pittman, T. S. Scibienski, Trustees of Robert Driscoll & Julia Driscoll & Robert Driscoll, Jr., Foundation." The "primary occupation" was answered: "To provide hospital care for indigent children." The land was properly described and the inquiry as to the use of the land was answered: "All of the above land is being used exclusively for the raising of crops."

2. The political subdivisions involved were: Nueces County, Texas, City of Corpus Christi, Corpus Christi Independent School District, West Oso Independent School District, Lower Nueces River Water Supply District, and Corpus Christi Junior College District.

Other information found in the form disclosed that the particular acreage involved in West Oso Independent School District had a cotton allotment of 112.8 acres and for grain 229.3 acres; that there were no hunting and fishing leases thereon but that the land was under lease for oil, gas, and other minerals "with production on part of it." It was shown that the land was in the possession of "Wallace Redding—Tenant Farmer." The claim was supported by the affidavit of each of the three Trustees.

The sworn statement, having been presented to the tax assessor, was rejected by a form letter in which the following blanks were checked as grounds for rejection.

"(x) Agricultural income is less than other income

(x) Applicant is not a 'Natural person'

(x) Applicant is not in the business of agriculture

(x) Agriculture is not the primary occupation and source of income."

Following this rejection, the Trustees, or their representatives, appeared before the Board of Equalization where their claim was again rejected. The original petition in this cause having been filed on January 31, 1968, the Trustees went to trial upon their second amended original petition wherein they sought a mandatory injunction requiring each of the assessors to place the properties upon the rolls as "land in agricultural use," for a prohibitory injunction restraining the several taxing agencies from attempting to collect any taxes except those due under an "agricultural use" designation, and for a prohibitory injunction restraining the fixing of any lien on the properties, etc.

Included in the petition were allegations that the total taxes levied upon the properties of the Trustees for the year 1967 by all of the agencies was $26,823.02, whereas, if the agricultural use designation had been accepted, the total taxes for that year would have been only $1,753.05. The extra tax burden placed upon the Trustees was, therefore, calculated to be $25,069.97. A general allegation covering the year 1968 claimed the denial of the designation resulted in the levy of "excessive" taxes in "an amount greater than" $25,000.00.

The taxing agencies answered by pleas in abatement and special exceptions (which we do not elaborate upon since there is no showing that they were called to the attention of the Court) a general denial and a cross-action for the taxes, interest, penalties, etc., based upon assessments which denied the agricultural use designation. At the conclusion of the evidence, the trial court overruled the motion for instructed verdict filed by the taxing agencies and submitted the case to the jury upon two special issues.[3] Negative answers having been returned to both questions, judgment was rendered for each of the several taxing agencies for the taxes then due together with penalties, interest, etc., along with foreclosure of the tax liens thereon.

As Exhibit A to this opinion, we reproduce Trustees' Exhibit 13, showing the schedule of net ordinary income, "Russell Farm Block," for the fiscal years shown thereon, noting in passing that (a) the *net* income from agriculture exceeded that from oil and gas in only two of the five years shown; (b) the ad valorem taxes assessed on the non-mineral estate therein was from two to five times the net income from the agricultural use thereof; and (c) even with the income from the oil and gas, a net profit from the land was shown in only two years out of the five included. The impact of the

---

3. The issues, identical except for the year involved read: "Do you find from a preponderance of the evidence that on January 1, 1967, agricultural use was the primary occupation and source of income of the Plaintiffs in their capacity as Trustees?"

ad valorem taxes upon this farming land is, therefore, clear.

To show the complete picture, however, the taxing agencies call to our attention the fact that the Foundation is engaged in a much broader economic undertaking than that shown in our Exhibit A. As Exhibit B, attached to this opinion, we reproduce the defendants' Exhibit 2, being information compiled by the accountant for the Trustees, to which has been added gain from the sale of capital assets brought out on cross-examination. Thus, it is noted that the gross income of the Trustees, even omitting the questionable item of gain from sale of capital assets, was greater from the activities in connection with oil and gas than from agriculture in four of the years shown. The contrast is greatly increased when we recognize that gross income from agriculture is reduced by the "crop expenses" illustrated in Exhibit A, whereas there is no similar reduction of the gross income from the mineral estate.

We are faced with a threshold question posing the contentions of the taxing agencies that the Foundation is not eligible for the designation sought because (a) the lands involved were not "owned by natural persons," (b) who used the lands in the "raising of livestock or growing of crops," etc., (c) "as a business venture for profit," and (d) "which business is the primary occupation and source of income of the owner." Article VIII, § 1–d, subdivision (a), Constitution.[4] The answers to these questions, aimed at the very heart of the controversy, will simplify our disposition of this cause.

In our consideration of the problem, we are confronted with two apparently conflicting rules of construction. The first requires us to consider the Constitution as a whole and as if each part had been adopted at the same time. This rule of law is epitomized in the language found in Collingsworth County v. Allred, 120 Tex. 473, 40 S.W.2d 13, 15 (1931):

"The Constitution must be read as a whole, and all amendments thereto must be considered as if every part had been adopted at the same time and as one instrument, and effect must be given to each part of each clause, explained and qualified by every other part. Gilbert El. R. Co. v. Kobbe, 70 N.Y. 361. Different sections, amendments, or provisions of a Constitution which relate to the same subject-matter should be construed together and considered in the light of each other. * * *"

See also, Purcell v. Lindsey, 158 Tex. 541, 314 S.W.2d 283, 284 (1958).

The keystone of the law of taxation in Texas is to be found in the very first sentence of Article 8, § 1 of the Constitution: "Taxation shall be equal and uniform." Our courts being committed to a strict construction of the constitutional and statutory tax exemption provisions, one seeking exemption from taxation has the burden of showing clearly that he comes within the requirements of the constitutional provision which he invokes. Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., 410 S.W.2d 824, 825 (San Antonio, Tex.Civ. App., 1966), affirmed, 426 S.W.2d 943 (Tex. Sup., 1968), and cases therein cited.

4. The provision reads: "All land owned by natural persons which is designated for agricultural use in accordance with the provisions of this Section shall be assessed for all tax purposes on the consideration of only those factors relative to such agricultural use. 'Agricultural use' means the raising of livestock or growing of crops, fruit, flowers, and other products of the soil under natural conditions as a business venture for profit, which business is the primary occupation and source of income of the owner."

*A. The Natural Persons Provision:*

The taxing agencies contend vigorously that the Trustees are ineligible for the agricultural designation because they are not within the classification of "natural persons" found in the provision. We turn to the second sentence of Article 8, § 1, which reads:

"All property in this State, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value, which shall be ascertained as may be provided by law."

Of course, the Trustees, as individuals, are "natural persons" within the traditional definition thereof.[5]

Although the provisions of Article 8, § 1 of the Constitution recognized the distinction between natural persons and private corporations, the Legislature immediately adopted what is now Article 7149, V.A. C.S., defining the word thus: "The term, 'person,' shall be construed to include firm, company or corporation." The two provisions, one constitutional and the other statutory, are complementary, not conflicting. Natural persons, such as partners, cotenants, and trustees, etc., are "owners" and we have no difficulty in finding that the framers of this amendment did not mean to exclude such classes from the benefit of the amendment. Farrar v. Board of Trustees, etc., 150 Tex. 572, 243 S.W.2d 688, 692 (1951). See also, Article 7152(6), V.A.C.S.

In the broadest and most comprehensive language, the Decedent vested legal title to all of her residuary estate in the Trustees with full and plenary power to manage, sell, encumber, and otherwise control the use thereof. There were no limitations placed upon the powers of the Trustees under the Will except the use of good judgment and honesty in the management thereof. The title to the property vested in the Trustees, not in the Foundation which was to be the recipient of the net income from the property itself.

Thus, the Trustees, under the provisions of Article 7152(6), supra, were required to render the property for taxation. In the case of Texas Fidelity & Bonding Company v. City of Austin, 112 Tex. 229, 246 S.W. 1026, 1029 (1922), the insurance company, as required by statute, had deposited certain bonds with the State Treasurer in Austin, as Trustee, in order to qualify to do business in the State. The City of Austin sought to impose ad valorem taxes upon such bonds notwithstanding the fact that the insurance company was domiciled in Waco. The court held that the bonds had a taxable situs in Austin, saying:

"Since the state treasurer was the trustee of the securities deposited with him, it was his duty to have rendered these securities for taxation for the year 1911, * * *.

* * * * * *

"The securities being personal property in the hands of the state treasurer *as trustee in his official capacity,* they were taxable at Austin, his official residence." (Emphasis ours.)

The Trustees, not the Foundation, had the legal title to the property involved in this suit; and, as owners, the Trustees were required to render the same for ad valorem taxes. Article 7152(6), supra; Bogert, Trusts & Trustees (2d Ed.), § 602.

As a general rule, property held in trust is assessed to the Trustee as holder of the legal title and not to the beneficiary,

_____

5. "Persons are divided by law into either natural or artificial. Natural persons are such as the God of nature formed us; artificial are such as are created and devised by human laws, for the purposes of society and government, and are called corporations or bodies politic." 1 Blackstone's Com. on the Law, 67.

even though the tax is in substance on the interest of the beneficiary. 84 C.J.S. Taxation § 100, p. 215. There is no rigid or exact form required to vest title to property in a person to make it subject to taxation. Childress County v. State, 127 Tex. 343, 92 S.W.2d 1011, 1015 (1936). See also: City of Beaumont v. Fertitta, 415 S.W.2d 902, 909 (Tex.Sup., 1967).

We conclude, consequently, that the Trustees are "natural persons" within the contemplation of subdivision (a) and as such are entitled to the benefits of the designation, if they otherwise meet the tests of the amendment.

### B. Agricultural Use of the Land:

■ The second requirement found in subdivision (a) is that the land must be used in " * * * the raising of livestock or growing of crops, fruit, flowers, and other products of the soil under natural conditions * * *." Literally, the contention of the taxing agencies is untenable, but a persuasive argument is made in the briefs which this short excerpt points up:

"They [the Trustees] have no employees that till the soil, plant the crops, or harvest the crops. They have no farm machinery or farm equipment for tilling the soil or planting the crops or harvesting the crops. They merely lease out real estate on a sharecrop basis in the same manner that they lease their hotel, office building, their oil and gas interests and their other city property."

To this, the agencies add that for the first few years after the death of Mrs. Driscoll the Trustees actually operated the farms through employees, but changed the type of operation apparently because of the federal tax consequences of such operation upon the Foundation's status. The reason for the change is not clear in our record, but it is certain that a change from actual operation to a sharecrop basis did take place about the year 1950.

From this premise, the taxing units argue that the amendment was designed "with the purpose of giving relief to the small farmer," "actively engaged" in farming for his living, who finds that his property is now more valuable for uses other than farming because the city has encroached upon his formerly rural area. Thus, it is argued, the amendment should be construed as applicable only to such person under such circumstances. We find no merit to this contention.

In Cramer v. Sheppard, 140 Tex. 271, 167 S.W.2d 147, 154 (1942), it was said:

"The rule has long prevailed in this State that constitutional provisions should not be given a technical construction which would defeat their purpose. The meaning of a constitutional provision is fixed when it is adopted, and it is not different at any subsequent time. It should be construed in the light of the conditions existing at the time of adoption."

This self-executing provision[6] of the Constitution now under consideration must be construed with the basic provisions of the same Constitution of which it is a part. There was no difference in the tax consequences arising out of the agricultural use of land by natural persons and private corporations before its adoption. There is no reason now to strain the meaning of the words used to require that the natural persons therein granted the benefits of the amendment should be required to till the soil personally. We are not persuaded that

6. From Mitchell County v. City Nat. Bank, 91 Tex. 361, 43 S.W. 880, 883 (1898), we take this: "In his work on Constitutional Limitation (page 100) Mr. Cooley says: 'A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected or the duty imposed may be enforced; * * *.' " See also, Austin v. Campbell, 210 S.W. 277, 279 (Texarkana, Tex.Civ.App., 1919, error ref.).

such could not be accomplished through the use of the sharecrop tenancy arrangement found in this case. To hold otherwise would be to interpolate words into the amendment which are neither required nor necessary to give it full effect. Cramer v. Sheppard, supra; 16 C.J.S. Constitutional Law § 19, pp. 81–82.

We hold, therefore, that the Trustees are not to be denied the coveted designation solely because the land was cultivated by a tenant rather than the Trustees personally, or through others who occupied the legal relationship of employees to the Trustees.

### C. Business Venture for Profit:

Theoretically, the Trustees undertook the farming operations for profit although the achievement of the purpose was thwarted several times during the period we have under consideration. The very purpose of the sharecrop tenancy arrangement was to procure competent and able professional farmers who would operate the farms in accordance with sound agricultural concepts to the end that the crops therefrom would not only be prolific but that the soil itself would be improved, not impoverished. The lease with the tenant, containing some unusual provisions, authorized supervision of the farming operations which would normally be inconsistent with the usual landlord-tenant relationship.

The Trustees, with admirable foresight, have sought to preserve and improve the land through the application of sound horticultural practices. But, at the same time, the Trustees have sought to recoup a profit from the operation of the farms. Such a profit motive, especially when the profits are devoted to the admirable purpose upon which they are actually spent, is commendable. They are not to be denied the designation because in some years they failed to achieve a profit. Indeed, in some of the years involved, it was the impact of ad valorem taxes which prevented their ac-

complishment of the goal. We hold that the Trustees are entitled to the designation, insofar as the third requirement is concerned.

### D. The Primary Occupation and Source of Income:

The Trustees, as we shall demonstrate, do not qualify for the designation sought under the fourth requirement of the subdivision: " * * * which business is the primary occupation and source of income of the owner." Again, we construe the words in the usual meaning and attempt to find the intent of the electorate as expressed in the organic law, just as we have done in the prior sections. In so doing, we are constrained to hold that the Trustees do not qualify for the exemption.

In making this determination, we bear in mind that when the Trustees sought the designation, they listed their primary occupation: "to provide hospital care for indigent children." This is not the determinative factor—although a true statement. The statement quoted was merely the end result sought by the Trustees in the management of the corpus of the estate. The ultimate goal of a private corporation organized for profit is to return financial gain to its stockholders; but, when classified as to the field in which it engages, it could be the operation of a railroad, the publication of a newspaper, the management of a bank, or any one of the myriad of pursuits in which the corporate form of ownership is employed in the frequently elusive pursuit of profits for its stockholders.

The Trustees must go farther and establish that this "agricultural use" amounts to a business (which we have held), and "which business is the primary occupation and source of income of the owner." Counsel for the Trustees would have us include in the definition of "primary" the thought that it is "first in order of time or develop-

ment or in intention; primitive; fundamental * * * first in dignity or importance." (Citing Webster's International Dictionary, Unabridged, 2d Ed.) This, fortuitously, coincides with the testimony of one of the Trustees that when Col. Driscoll came to South Texas more than 130 years prior to the trial and began the accumulation of the properties now owned by the Trustees, he realized that the farming and ranching industry would last—people would have to be fed, and that the land would always be there to provide the food. This was, under the theory of the Trustees, the primary occupation of Col. Driscoll, as well it may have been. From this premise, the Trustees argue that the discovery of oil on the lands many years before the death of the Testatrix, was simply an unexpected and unanticipated collateral benefit from the ownership of the land; and, since it is well known that the mineral estate is normally depleted through production, the receipt of income from the mineral estate should not be considered in passing upon the occupation of the Trustees. During the nearly forty years of oil production from the Driscoll lands, the decedent and her Trustees have been able to devote large sums to the public welfare, and we do not in any manner minimize the contribution of the Trustees to the public at large.

The difficulty under which the Trustees labor stems from the fact that a large, if not commanding portion of the income received for use in the field of public welfare comes not from the careful operation of the land for agricultural purposes but from the production of minerals therefrom. Even a casual reference to Exhibit B, covering a five-year period, shows this beyond question. The relationship which the Trustees bear to this land is a far cry from that borne by Col. Driscoll and his descendants many years ago. The contention of the Trustees will not stand.

We prefer to adopt, for the purposes of this case, these excerpts from Webster's Third New International Dictionary (1967):

"Primary: first in rank or importance: Chief, Principal";

"Occupation: the principal business of one's life: a craft, trade, profession or other means of earning a living"; and

"Source: the point of origin * * *"

In construing this subdivision, we turn to analogous provisions of the Bankruptcy Act, particularly the definition of "Farmer" as found in 11 U.S.C.A. § 203(r)—"* * * an individual who is primarily bona fide personally engaged in producing products of the soil, * * * the principal part of whose income is derived from any one or more of the foregoing operations, * *." [7]

■ Thus, "the primary occupation and source of income of the owner," the Trustees in this instance was not the agricultural use of the land in question, or the agricultural use of all of the lands owned by the Trustees. It was their burden to bring forward proof to establish that fact to the satisfaction of the trier of the facts. Having failed so to do, the Trustees may not prevail. In making this determination we have proceeded from the premise that in construing a constitutional provision, the fundamental purpose is to ascertain and give effect to the intent of the framers of the Constitution and of the people who adopted it. Deason v. Orange County Water Control & Imp. Dist., 151 Tex. 29, 244 S.W.2d 981, 984 (1952).

---

7. The requirement in the Bankruptcy Act that the debtor must be "personally" engaged in tilling the soil presents a factor not present in our constitutional provision. Thus Shyvers v. Security-First Nat. Bank, 108 F.2d 611, 126 A.L.R. 674 (C.A., Cal., 1939), and similar cases that an absentee landlord with sharecrop tenants is not a farmer does not detract from our prior holding that the Trustees are eligible as being in business for profit. We have no such requirement that the owner be "personally engaged" in the farming activities.

SCHEDULE OF NET ORDINARY INCOME - RUSSELL FARM BLOCK - FISCAL YEAR ENDED:

| | 4/30/64 | 4/30/65 | 4/30/66 | 4/30/67 | 4/30/68 |
|---|---|---|---|---|---|
| Income | | | | | |
| Agriculture | 28,143 | 14,783 | 38,192 | 25,902 | 15,695 |
| Oil & Gas | 7,665 | 7,782 | 8,426 | 26,055 | 21,132 |
| Miscellaneous | 2,929 | 166 | 310 | 145 | - 0 - |
| Total Ordinary Income | 38,737 | 22,731 | 46,928 | 52,102 | 36,827 |
| Expenses | | | | | |
| Crop Expenses | 20,331 | 10,574 | 26,784 | 17,831 | 9,457 |
| Administrative Costs | 2,037 | 3,339 | 5,303 | 5,532 | 5,305 |
| Total Expenses before Taxes | 22,368 | 13,913 | 32,087 | 23,363 | 14,762 |
| Net Ordinary Income before Taxes | 16,369 | 8,818 | 14,841 | 28,739 | 22,065 |
| Ad Valorem Taxes - Land | 25,209 | 27,088 | 25,714 | 24,953 | 26,823 |
| Ad Valorem Taxes - Minerals | 277 | 292 | 383 | 1,237 | 1,489 |
| Total Ad Valorem Taxes | 25,486 | 27,380 | 26,097 | 26,190 | 28,312 |
| Net Profit (Loss) after Taxes | (9,117) | (18,562) | (11,256) | 2,549 | 6,247 |

E X H I B I T   B

DETAILED ANALYSIS OF GROSS INCOME OF DRISCOLL FOUNDATION FOR FISCAL YEARS ENDED:

| GROSS INCOME | 4/30/64 | 4/30/65 | 4/30/66 | 4/30/67 | 4/30/68 |
|---|---|---|---|---|---|
| Agriculture | 285,028 | 441,743 | 523,402 | 584,952 | 488,747 |
| Other | | | | | |
| Oil & Gas Royalties | 452,157 | 434,957 | 442,500 | 483,346 | 534,079 |
| Lease Sales | 160,019 | 103,262 | 220,104 | 16,552 | 6,900 |
| Delay Rentals | 28,527 | 48,294 | 44,991 | 33,086 | 31,821 |
| Hotel Rent | 240,537 | 164,422 | 144,233 | 108,794 | (228,240) |
| City Property Rent | 15,607 | 9,777 | 8,400 | 8,400 | 13,200 |
| Dividends & Interest | 136,749 | 142,650 | 141,660 | 124,563 | 101,694 |
| Miscellaneous | 4,450 | 12,118 | 11,380 | 4,737 | 4,017 |
| Russell Farm Blocks - Other Than Agriculture & Oil | 2,929 | 166 | 310 | 145 | - 0 - |
| Total Ordinary Gross Income | 1,326,003 | 1,357,389 | 1,536,980 | 1,364,575 | 952,218 |
| Gain on Sale of Capital Assets | 152,697 | 705,401 | 84,890 | 344,901 | 136,612 |
| | 1,478,700 | 2,062,790 | 1,621,870 | 1,709,476 | 1,088,830 |

The words selected by the framers of this amendment are simple and in common usage. The agricultural use of the land in question was neither the primary occupation of the Trustees nor was it the primary source of their income. The appellee taxing agencies have brought forward eight cross-points, two of which assert that the trial court erred in overruling their motion for peremptory instruction because (a) the Trustees had failed to establish that their primary occupation was agriculture; and (b) the Trustees had failed to establish that their primary source of income was from agriculture. Our analysis of the evidence has demonstrated the soundness of these points. Thus, the procedural points of the Trustees complaining of admission of evidence, objections to the charge and the accompanying definition, etc., are of no consequence and are overruled.

The judgment of the trial court was correct and is affirmed.

STEPHENSON, Justice (concurring).

I concur in the disposition of this appeal and agree that the case should be affirmed. However, I do not concur in that portion of the majority opinion holding appellants to qualify as "natural persons" as that term is used in the provision of the Constitution in question.

I interpret "all lands owned by natural persons" to mean the beneficial owner of the land. Even though the legal title to the land involved in this litigation was vested in the Trustees, the beneficial owner of the land is the Foundation created by the testamentary trust. No one contends the Foundation is a "natural person."

If this land should qualify under this provision of the Constitution, the Foundation and not the Trustees individually would receive the benefit. To further demonstrate the inequity of the majority holding, if the testator had named a bank as Trustee for this testamentary trust, the same land could not qualify, simply because the Trustee was not a natural person.

Further, under this holding, a corporation owning land for future industrial purposes, could convey it in trust to a natural person as Trustee, for agricultural use, and receive the benefit of this Constitutional provision. I do not conclude this interpretation to be a reasonable construction of such provision.